STATE OF MAINE & CONNECTME ) 
AUTHORITY, )
              )
              Plaintiffs )
              )
           v. )
              )       Docket No.: BCD-CV-14-56
BIDDEFORD INTERNET )
CORPORATION d/b/a Great Works )
Internet )
              )
            Defendant )

## AMENDED DECISION AND JUDGMENT

This Amended Decision and Judgment addresses issues raised in the Defendant's Motion to Alter And/Or Amend Judgment and Defendant's Motion for Amended And/Or Additional Findings of Fact, filed after the court issued its original Decision and Judgment dated October 5, 2016.

This case centers on the validity of an assessment imposed by Maine statute upon users of a certain federally subsidized broadband communications network. The State and the state agency that is designated by statute to receive the assessment seek to collect unpaid amounts from a user that challenges the assessment as an unconstitutional tax and also challenges the Plaintiffs' standing.

The case came before the court for a jury-waived trial April 27-28, 2016. Both parties presented evidence in the form of sworn testimony and exhibits. The trial was recorded. After the trial, the parties filed proposed findings of fact and conclusions of law. Oral argument was held August 1, 2016, at which point the court took the case under advisement. The court issued its original decision October 5, 2016 and the Defendant's post-judgment motions were

timely filed. Briefing on the post-judgment motions was complete with the filing of Defendant's reply memoranda November 8, 2016. Oral argument on the motions was requested. Oral argument was held December 16, 2016, at which point the court took the motions under advisement.

Based on the entire record, the court adopts the findings of fact and conclusions of law set forth below, and renders judgment as set forth below.

## I. Background

Plaintiff ConnectME Authority (the "Authority") is an agency of Plaintiff State of Maine that was established "to stimulate investment in advanced communications technology infrastructure in unserved or underserved areas" in Maine. 35-A M.R.S.A. § 9203(1) (2010). The Authority was also created to promote universal broadband service by maximizing federal and private resources to support the deployment of broadband infrastructure in unserved and underserved areas of the State. Id. (2015); 35-A M.R.S.A. § 9202-A (2015).

Broadband involves the transmission of data at high speeds, generally over the Internet, and it can be accomplished with both fiber optic and digital subscriber line ("DSL") technology. Stip. ¶3.[1] Among the currently available means of data transmission, fiber optic technology is the fastest means of transporting data between two points. Id. ¶5. Data transmission is via fiber optic cable, which is essentially a bundle of individual glass or plastic strands, each of which can be lit in order to transmit data by means of an associated light signal or light communication transmission. Id. ¶6. When a glass or plastic fiber optic strand is lit with a beam of light, the beam of light can carry coded information along the strand. Id. ¶4.

---

[1] DSL is a different technology for bringing broadband to residences and businesses using ordinary copper telephone lines that have been specially conditioned. (Stip. ¶7.)

2

"Dark fiber" is the term applied to unlit fiber optic strands. Dark fiber providers—owners of fiber optic cable networks—sell or lease strands of dark fiber to telecommunications service providers who use the strands to transmit data on behalf of their customers. *See id.*

Defendant Biddeford Internet Corporation is a Maine corporation located in Biddeford, Maine, that, at all relevant times, has offered telephone and Internet services to residential and business customers. *Id.* ¶ 1. Defendant does business under the names Great Works Internet and is referred to herein as "GWI." At all relevant times, GWI has provided broadband service to its residential and business customers using fiber optic strands and/or DSL. *Id.* ¶ 8.

GWI and telecommunications service providers like it are generally referred to as "CLECs" within the telecommunications industry, CLEC being the acronym for "competitive local exchange carrier." *Id.* ¶ 10. Under Title 35-A and the rules of the Maine Public Utilities Commission ("PUC"), a CLEC is any local exchange carrier that is not an "incumbent local exchange carrier," or, to use the acronym, an "ILEC." *Id.* An ILEC is defined by 35-A M.R.S.A. § 102(9-B) and 35-A M.R.S.A. § 9216(1)(B), in pertinent part, as "a telephone utility that provided single-party service, voice grade access to the public switched telephone network in a defined service territory in the State on February 8, 1997, or its successor," or that is "designated as an [ILEC] pursuant to 47 U.S.C. § 251(h)(2)."

There are currently more than 20 ILECs operating in Maine, including FairPoint, which at all relevant times has provided telephone service for roughly 80% of the telephone service area in Maine. *Id.* ¶ 12.[2] The number of ILECs in Maine has stayed roughly the same since 2009. *Id.* There are currently more than 70 CLECs certified by the PUC, including GWI. *Id.* ¶ 13.

---

[2] FairPoint has been a subsidiary of FairPoint Communications, Inc., at all relevant times. Trial Transcript Vol. II (Tr. II): 62-63. FairPoint is one of the entities resulting from the 2008 merger between FairPoint affiliates and Verizon New England, Inc., and its affiliates. *Id.*

Telecommunications service providers in Maine often compete for telecommunications customers. *Id.* ¶ 17. FairPoint and GWI compete in Maine for residential and commercial telephone and Internet business.

At all relevant times, pursuant to the 1996 Federal Telecommunications Act and subsequent decisions of the Federal Communications Commission ("FCC") and the Federal Courts, FairPoint has been required to make some of its "unbundled network elements" ("UNEs") available to GWI and other CLECs at what are called TELRIC prices that have been approved by the Maine PUC. *Id.* ¶ 14; *see also Verizon New England, Inc. v. Maine Pub. Utils. Comm'n*, 509 F.3d 1, 4-6 (1st Cir. 2007). TELRIC, which refers to a cost methodology required to be used by the FCC under certain circumstances, is short for the "total element long-run incremental cost" to FairPoint for a given UNE. (Stip. ¶ 15.) TELRIC prices are "highly favorable" to FairPoint's competitors. *See e.g. Verizon New England, Inc.*, 509 F.3d at 5 (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 374 (1999).

A. The Authority and the ConnectME Fund

The Legislature established the ConnectME Fund in 2006 as a "non-lapsing fund administered by the Authority for the purposes of supporting the activities and projects of the Authority under [Chapter 93 of Title 35-A]." 35-A M.R.S.A. § 9211(1). The ConnectME Fund is intended to be funded through an assessment on communications services providers in the State of Maine on a competitively neutral basis. *Id.* § 9211(2). According to Phillip Lindley, executive director of the Authority and a State's witness at the trial, the ConnectME Fund is one source of funds for the Authority's activities and projects, but not the only source of funds. Trial Transcript Vol. I (Tr. I): 46-47 (testimony of Phillip Lindley). The Authority's activities and projects are also supported by the Broadband Sustainability Fund, *see infra*, and federal grants. *Id.; see also* 35-A M.R.S.A. § 9216(5)-(6) (2010).

4

The Authority has awarded at least 122 grants totaling approximately $9.8 million, averaging $80,327 per grant, from the ConnectME Fund to ILECs and CLECs in order to promote the construction of telecommunications infrastructure in unserved and underserved areas of the State. Tr. I: 47-49 (Lindley); Pl.s' Ex. 19. These grants have benefited the recipients thereof and the consumers who live in the formerly unserved or underserved areas. Tr. I: 49-51 (Lindley). Thus, both ILECs and CLECs have furthered the goals of the State to provide access to unserved areas in Maine. Tr. I: 109 (Lindley). Many of the ConnectME Fund grants have funded over 80% of the projected costs of a given project and resulted in increased broadband access in unserved and underserved areas. Tr. I: 98 (Lindley).

B. The 2009 Federal Grant

In 2009, private telecommunications services providers began meeting with representatives of the State, including Mr. Lindley, to address the lack of middle-mile broadband capacity in Maine. Tr. I: 86 (Lindley). Middle-mile broadband is akin to an interstate highway; it traverses the whole state and has connections that can be likened to an interstate highway's off ramps to "last-mile broadband." *Id.* at 52-53 (Lindley). Last-mile broadband is analogous to local roads off an interstate highway—last-mile broadband connects to the homes and places of business of individual customers. *See id.*

As of 2009, FairPoint was the primary dark fiber provider in Maine—it owned and operated nearly all of the middle-mile fiber optic cable network in Maine, which served only a limited portion of the State. During 2009, the aforementioned group developed a projected route for a new middle-mile fiber optic cable line project to be located in unserved areas in Maine, and coined a name for the project, the "Three Ring Binder." *See id.* The project was intended to put dark fiber where there was no dark fiber at all. Tr. I at 119-20.

5

The Three Ring Binder was intended to serve as the broadband equivalent of an interstate highway through rural parts in Maine. *See id.* According to the testimony of Fletcher Kittredge, chief executive officer of GWI, a major benefit of the middle-mile dark fiber that the Three Ring Binder would make available to CLECs such as GWI is that they could connect to it at any point. In this regard, it differed from the existing middle-mile dark fiber available from FairPoint, which generally could only be accessed by connecting to FairPoint's central offices that are often far apart. Tr. I: 140-146 ( Kittredge). The dark fiber in the Three Ring Binder could be used for both middle mile fiber and as last mile fiber. J. Ex. 1 at GWI 3946; *see, e.g.* Tr. I 141–143 (Kittredge); Joint Ex. 1 at GWI 3931, 3936.

Among other things, the Project was intended to provide 100 Mbps fiber optic broadband capability over an 1,100-mile network that would pass through more than 100 communities and reach 110,000 households, 600 community anchor institutions, and a number of last-mile CLEC and ILEC service providers. *Id.* ¶ 19. At least 75% of the areas intended to be served by the Three Ring Binder were underserved or unserved as of 2009. Joint Ex. 1 at GWI-3932.

In July 2009, GWI applied for a federal grant to build the Three Ring Binder Project. Joint Ex. 1. The grant application was made to the United States Department of Commerce, National Telecommunications and Information Administration, pursuant to the federal American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (2009).

GWI's application required it to assign the project to a new entity, Maine Fiber, that would be responsible for constructing and owning the Three Ring Binder Project. *Id.* Maine Fiber would be required to make the Three Ring Binder Project available on an "open access" basis so that any ILEC or CLEC could purchase or lease dark fiber from the Three Ring Binder to extend last-mile service to its residential or business customers. *Id.*; Tr. I: 54 (Lindley). The

6

Authority, the Governor's office, the State's legislative delegation to Washington, and many CLECs, ILECs, and municipalities supported GWI's application. Tr. I: 53 (Lindley), 92 (Kittredge); Joint Ex. 1 at GWI-3997-GWI4009.

In December 2009, GWI received a federal grant in the amount of $25,402,904 to fund the construction of the Three Ring Binder Project ("the Grant"). Stip. ¶18. The Grant provided approximately 80% of the cost for the construction of the Three Ring Binder Project and required a 20% match of the estimated initial capital cost to come from private individuals or entities. Stip. ¶25.

The Grant required GWI to transfer the right to receive the funds from the Grant to Maine Fiber and required the Three Ring Binder to be completed within three years from the Grant date, December 1, 2009. *Id.* ¶24; Joint Ex. 2 at 3; Joint Ex. 1 at GWI-4067-GWI-4073; Pl.'s Ex. 4 at 1-4.

On April 17, 2010 and June 30, 2010, GWI assigned the Grant to Maine Fiber. Stip. ¶24. As a result, Maine Fiber holds title to the Three Ring Binder Project and is a "dark fiber provider" within the meaning of Maine's Broadband Sustainability Act, 35-A M.R.S.A. §§ 102 and 9216. *Id.* ¶¶27-28. Since 2010, and at all relevant times, Maine Fiber has made the Three Ring Binder Project available for use by telecommunications service providers such as GWI on an open-access basis. *Id.* ¶31.

C. An Act to Enable the Installation of Broadband Infrastructure

When Maine Fiber was formed, it lacked legal authority to attach dark fiber and equipment to utility poles owned by ILECS and other pole owners, and the legal authority to construct the Three Ring Binder within the public rights of way. Pl.'s Ex. 4 at 4-7; Tr. I: 53-54 (Lindley). In light of the three-year timeline for completion of the Three Ring Binder, emergency legislation in the form of LD 1778, "An Act to Enable the Installation of Broadband

7.

Infrastructure," was introduced in February 2010, during the 124th Maine Legislature's second session, to provide Maine Fiber with the necessary authority. Pl.'s Ex. 2; Tr. I: 54-55 (Lindley).

On February 24, 2010, the Legislature's Joint Committee on Utilities and Energy held a public hearing at which GWI, Maine Fiber, and the Authority testified in favor of LD 1778. *See* Pl.'s Exs. 4-5. FairPoint, however, opposed LD 1778, asserting that the Three Ring Binder Project would overbuild the existing broadband network. Pl.'s Ex. 3 at 122-24, 127-28; Tr. I: 56-57 (Lindley).) Following a number of work sessions regarding L.D. 1778, the Chairs of the Joint Committee on Utilities and Energy directed a working group to get together and come up with a compromise that would be acceptable to both sides. Tr. I: 57 (Lindley); Tr. II: 109 (testimony of Dwight Allison, chief executive officer of Maine Fiber). GWI was not part of the working group. Tr. II: 110 (Allison).

The working group reached a compromise that was acceptable to Maine Fiber, FairPoint, and others in the working group. Tr. I: 58 (Lindley). The compromise was memorialized in Committee Amendment A to LD 1778. In addition to granting Maine Fiber pole attachment rights and the right to construct the Three Ring Binder within the public right of way, the Amendment provided for a "broadband sustainability fee" (BSF) to be collected from users of the Three Ring Binder's dark fiber and a new fund called the Broadband Sustainability Fund (BSF). Pl.'s Ex. 7. GWI did not oppose LD 1778, as amended by Committee Amendment A. Tr. I: 193 (Kittredge), 59 (Lindley).

Following a further amendment, LD 1778 was approved by the Maine House and Senate, becoming law on April 6, 2010, *see* 2009 Me. Laws ch. 612. Joint Ex. 4; Pl.'s Ex. 9. LD 1778 is codified in the Maine Revised Statutes at 35-A M.R.S. § 9216. *E.g.* Pl.'s Ex. 3.

As enacted in 2010, the Broadband Sustainability Act does not make mention of the Three Ring Binder or Maine Fiber, but it was drafted so as to make it applicable only to a dark

8

fiber provider that offers "federally supported dark fiber"—the parties agree that the only dark fiber provider in Maine that meets the definition in the Act is Maine Fiber and the only "federally supported dark fiber" in Maine is the dark fiber within the Three Ring Binder.

D. Mechanics of 35-A M.R.S.A. § 9216 and the BSF

The Broadband Sustainability Act imposed the BSF on any entity that purchased, leased, or otherwise obtained federally supported dark fiber from Maine Fiber. 35-A M.R.S.A § 9216(2). The Act required Maine Fiber to collect the BSF from these entities and remit the amounts collected to the Authority. *Id.* § 9216(3)[3].

The Authority, in turn, was required to deposit 5% of the funds received into the ConnectME Fund and was permitted to use said funds to support its activities under sections 9216 and 9204. *Id.* § 9216(4)(A). The Authority's 5% share of the BSF reflects a fair approximation of the actual cost to the Authority to administer section 9216. Stip. ¶48. The remaining 95% of BSF funds collected by Maine Fiber and remitted to the Authority was to be deposited into the Broadband Sustainability Fund. 35-A M.R.S.A. § 9216(4)(B). Under the statute, ILECs such as FairPoint were provided a right of first refusal to access the money in the Broadband Sustainability Fund. *Id.* § 9216(6). To receive a disbursement from the Broadband Sustainability Fund, an ILEC had to file a request for funds "together with a certification indicating that the funds requested will be used to deploy broadband infrastructure in unserved areas within the carrier's service territory." *Id.* § 9216(6)(B). Any remaining money in the Broadband Sustainability Fund was to be transferred to the ConnectME Fund. *See id.* § 9216(6)(D).

---

[3] Unless otherwise noted, references herein to section 9216 refers to the version in effect between April 6, 2010 and October 14, 2015, when the repeal of the BSF took effect. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015).

9

E. Construction and Operation of the Three Ring Binder

Construction of the Three Ring Binder began no later than March 2010. Maine Fiber permitted GWI to determine where the first segments of the Three Ring Binder would be built. Tr. I:195-96, 205-06.) At GWI's request, Maine Fiber built the first five-mile segment between Bath and Brunswick and the next segment between Portland and Biddeford. *Id.* Both segments directly benefited GWI by enabling it to provide broadband to important commercial customers. *Id.*

The Three Ring Binder was substantially completed in or around July 2012. *Stip.* ¶ 34.

F. Maine Fiber's Competitive Position Versus Other Providers of Dark Fiber

Since May 2010, and at all relevant times, Maine Fiber has made the Three Ring Binder Project available on an open-access basis without discrimination. Stip. ¶ 31. Because approximately 80% of the Three Ring Binder's initial capital cost was financed with government funds, Maine Fiber has been able to charge lower prices for licensing dark fiber than FairPoint, the provider of most of the other dark fiber in Maine, has charged, even when the BSF is factored into Maine Fiber's price. *Compare* Pl.'s Exs. 9 at 2, 43, 47; GWI Exs. 13 at 19; *with* Joint Ex. 1 at GWI 3943, 3980-81; Tr. I: 209-213 (Kittredge); Tr. II: 26 (Kittredge).

From February 2010 until no earlier than October 15, 2015, Maine Fiber's only significant competitor as a provider of dark fiber in Maine was FairPoint.[4] Joint Exh. 1 at GWI-3943 ("The incumbent local exchange carrier (ILEC) is currently the only existing service provider in the proposed funded service area for this middle mile project."); Tr. I: 143-146, 207-208.

---

[4] At various times since 2009, in addition to Maine Fiber and FairPoint, certain other telecommunications service providers in Maine have made limited amounts of dark fiber available for license to third parties. Joint Exhs. 17-20, 22-23. These other providers of dark fiber include MaineCom, Oxford Networks, Lincolnville Networks, and OTT. Joint Exhs. 17-20, 22-23.

10

Since 2009 or earlier, FairPoint has licensed its dark fiber in Maine to third parties at a price of $25 per strand mile. Joint Exh. 1 at GWI-3981. At all relevant times, the FairPoint dark fiber available for license to third parties connected FairPoint's central offices with one another and is called IOF (inter-office facility) dark fiber. Tr. I: 143-146.

Because approximately 80% of the Three Ring Binder's initial capital cost was financed with government funds, Maine Fiber has been able to charge substantially lower prices to users of its dark fiber than its competitor FairPoint has charged for its dark fiber. From February 2010 until no earlier than October 15, 2015, the prices at which Maine Fiber offered its dark fiber on the Three Ring Binder for license, even with the BSF included in the price, were substantially less than the prices at which Maine Fiber's competitor FairPoint made its dark fiber available for license in Maine. *Compare* Plaintiffs' Exhs. 43 & 47, GWI Exh. 13 at 19, and Plaintiffs' Exh. 9 at 2 (because the cost of dark fiber on the Three Ring Binder "is substantially lower than the market price for dark fiber in Maine, the small fee, $3 initially and going down to $2 after 5 years, still results in dark fiber being about 35% lower than the current market price") *with* Joint Exh. 1 at GWI-3943 ("The incumbent local exchange carrier (ILEC) is currently the only existing service provider in the proposed funded service area for this middle mile project."), Joint Exh. 1 at GWI-3980-GWI-3981, Tr. I: 209-213, and Tr. II: 26 ($25 per strand mile per month for FairPoint's IOF dark fiber, according to GWI). *See also* Joint Exhs. 17-20, 22-23.

G. The Three Ring Binder as Compared to Other Dark Fiber Networks

The Three Ring Binder is not the only federally-funded dark fiber project in Maine. For example, the evidence indicated that FairPoint has received substantial federal funds to extend or improve broadband service in Maine. Tr. I at 87-91 (Davis). However, among all

11

the projects receiving federal funds or State funds to expand broadband in unserved areas, the only project subject to the BSF is the Three Ring Binder project. Tr. I at 101-108 (Lindley).

On the other hand, there is no evidence that there have been any taxpayer-subsidized dark fiber network projects in Maine like the Three Ring Binder, in terms of scale. There is no evidence that any other dark fiber provider has received taxpayer subsidies anywhere close to the more than $25 million in federal funds awarded to develop the Three Ring Binder. As noted above, the ConnectME Fund grants average only $80,327 in amount—less than one-third of one percent of the federal grant to the Three Ring Binder.

As far as the evidence shows, the Three Ring Binder is the only dark fiber network in Maine that was created wholesale rather than being added to a dark fiber provider's existing network, and the only new network funded primarily with taxpayer funds. In these respects, the Three Ring Binder is, as far as the evidence shows, unique in the State of Maine.

That fact, coupled with the advantageous TELRIC pricing extended to CLECs such as GWI, furnishes a potential rationale for the BSF, as a means of reducing the competitive advantage that the Three Ring Binder enjoyed, by establishing funds through the ConnectME grants to enable the ILECs whose existing poles and lines are being used by the Three Ring Binder, as well as other telecommunications providers, to extend their own broadband networks.

H. GWI's Use of and Agreements Regarding the Three Ring Binder Project

Since 2010, GWI has gained access to, and has utilized, dark fiber and dark fiber strands in the Three Ring Binder. The terms under which Maine Fiber has granted GWI access to the Three Ring Binder have been memorialized in a series of Dark Fiber Use Agreements ("DFUA") between GWI and Maine Fiber. Stip. ¶32. Usage of dark fiber is measured in "strand miles," meaning one mile of one dark fiber strand. The original DFUA required GWI,

12

among other things, to pay Maine Fiber $10,000 per month for the use of up to 10,000 strand miles of dark fiber per month as soon as the Three Ring Binder Project was substantially completed. *Id.* ¶33.) GWI also expressly agreed that it "shall be responsible for any taxes or fees" including the BSF. Joint Ex. 10 at 7, § 5.

GWI and Maine Fiber have amended the DFUA multiple times, but the provision in which GWI agreed to be responsible for the BSF remained in force until GWI and Maine Fiber entered into the May 30, 2014 Dark Fiber Use and Settlement Agreement ("Dark Fiber Settlement"). Tr. I: 220-22 (Kittredge). The Dark Fiber Settlement resolved a lawsuit between GWI, on the one hand, and Maine Fiber and its CEO Dwight Allison, on the other. Tr. II: 11 (Kittredge); Pl.'s Ex. 34. In that Agreement, GWI agreed to pay Maine Fiber a fixed monthly fee for the right to use up to 10,000 strand miles per month of dark fiber and again agreed that it "shall be responsible for and shall pay any taxes or fees" including the BSF. Pl.'s Ex. 35 at 3-7, 9, § 5.

GWI is not the only entity to have obtained access to dark fiber and/or dark fiber strands from Maine Fiber. Stip. ¶¶38, 45. At all relevant times, Maine Fiber has billed the BSF to every entity, including GWI, that purchased, leased, licensed, or otherwise obtained dark fiber and/or dark fiber strands from Maine Fiber pursuant to former 35-A M.R.S.A. § 9216. *Id.* ¶38.

Coincidentally or not—Plaintiffs say not— GWI paid Maine Fiber's billings for BSF while the Three Ring Binder was being constructed and stopped paying the BSF component of Maine Fiber's bills around the time construction was completed. From approximately May of 2010 until May 2012, GWI paid Maine Fiber the BSF it was invoiced. *Id.* ¶39. This amounted to approximately $15,000, which Maine Fiber remitted to the Authority. *Id.* ¶40. Since June 2012, GWI has not paid any of the BSF billed to it by Maine Fiber. *Id.* ¶41. GWI has not

13

reduced its fees charged to customers to reflect the amount saved by nonpayment of the BSF. Tr. II: 4, 54-55.

In 2015, the 127th Maine Legislature voted to repeal the BSF fee, effective 90 days from adjournment. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015); Stip. ¶42. Calculated through and ending as of October 15, 2015, when the repeal took effect, the total amount billed to GWI for the BSF and not paid by GWI is $406,852. *Id.* ¶43; Joint Exh. 14. GWI does not challenge the accuracy of Maine Fiber's billing or the calculation of what would be due if GWI is liable for the BSF.

Maine Fiber has remitted approximately $776,000 in BSF to the Authority. *Id.* ¶45. To date, approximately $41,601 in BSF from the Broadband Sustainability Fund has gone unclaimed and was transferred to the ConnectME Fund for use by the Authority in accordance with 35-A M.R.S.A. § 9211. *Id.* ¶50.

Because the Broadband Sustainability Act applies only to the Three Ring Binder, no provider of dark fiber other than Maine Fiber has been required to collect the BSF from users of dark fiber.

I. Metcalfe's Law

One of the justifications that the Plaintiffs advance in defending the BSF against Defendant's challenges lies in Metcalfe's Law. According to Metcalfe's Law, the value of a telecommunications network such as the Internet increases in proportion to the square of the number of connected users, meaning that a network becomes geometrically more valuable each time a new user is connected to that network. *See* Pl.'s Ex. 45 at GWI-4286-4287. Thus, under Metcalfe's Law, GWI and all other CLECs benefit when the network to which they connect is expanded, even if the expansion is by a competitor. *Id.*; Tr. I: 182-185 (Kittredge Testimony). However, the growth in value curve levels out when a network reaches a certain size, because

14

the incremental increase in value attributable to each new connection becomes smaller to the point of being minimal. *See* Tr. I: 179-180 (Kittredge).

J. Benefits of the Three Ring Binder and the BSF

Under Metcalfe's Law, GWI and other users of the Three Ring Binder benefit from the expansions of broadband in Maine, but only to the extent that all users of the broadband network benefit. As GWI points out, there is no direct relationship between the BSF and any benefit conferred by the Authority to GWI and other users of the Three Ring Binder's dark fiber. Neither GWI nor the other users receive an exclusive benefit from the BSF, *i.e.*, a benefit that is not shared by other telecommunications providers.

On the other hand, GWI did benefit, uniquely and in a manner distinct from any other user, from the Three Ring Binder in being permitted to direct where the initial sections would be installed. GWI and other users of the Three Ring Binder also benefit, in a way that no users of other dark fiber do, from the fact that the Three Ring Binder was installed on existing poles and facilities owned by FairPoint and other ILECs, without, at least as far as the record discloses, any compensation to FairPoint and other ILECS that own those poles and facilities.

## II. *Analysis*

From the Plaintiffs' standpoint, this is a straightforward collection case. They seek judgment against GWI for $406,852—the amount that GWI acknowledges would be the amount due, with interest, if it is indeed liable to the Plaintiffs for the BSF. However, GWI's First Amended Answer and Counterclaim denies any liability to Plaintiffs for the BSF on various jurisprudential, constitutional and statutory grounds.

The Amended Answer includes affirmative defenses—lack of authority and lack of privity—that challenge the Plaintiffs' standing to collect amounts due from GWI for the BSF, and that challenge the legality of the BSF on several grounds, discussed in detail below.

15

The Counterclaim contains three counts for declaratory judgment (Counts I, III and IV) and a count for return of the BSF that GWI did pay, prior to June 2012 (Count II). The declaratory judgment counts seek to have the BSF declared invalid and unenforceable on a variety of grounds, including that it is an unconstitutional tax, that it violates GWI's rights to due process and equal protection, and that the BSF is preempted by federal law and/or violates the Supremacy Clause of the United States Constitution. In its post-trial filing, GWI did not pursue the preemption/Supremacy Clause objection to the BSF, so that issue is not considered further in this Decision and Judgment. GWI has pursued the standing, equal protection, due process and tax issues, and they are discussed below in the order just listed.

A. Whether the Authority has Standing to Collect the BSF Directly From GWI

GWI contends that the Authority lacks standing to collect the BSF directly, because the Legislature has explicitly placed that responsibility on Maine Fiber in 35-A M.R.S.A. § 9216(3). While GWI recognizes that the Authority was granted the implied power to do anything necessary "to exercise the powers granted in this chapter," it argues that the Authority was never given the power to collect the BSF at all. GWI further argues that, to the extent the Authority seeks to collect from GWI as a third-party beneficiary to the contract between GWI and Maine Fiber, the Authority failed to plead third-party beneficiary status or raise that issue in its pretrial statement of factual and legal issues and, in any event, the contract does not reflect an intent to benefit the Authority.

Plaintiffs contend that the Authority has the express legal right to directly collect the unpaid BSF from GWI because it has the power to file a lawsuit, to "do any act necessary or convenient to exercise the powers granted in [Chapter 93 of Title 35-A] or reasonably implied by th[at] chapter[.]" Plaintiffs further argue that they are third-party beneficiaries of the July 16, 2010 DFUA and the May 30, 2014 Dark Fiber Settlement with respect to the provision in

16

which GWI agrees to be responsible for paying the BSF. Plaintiffs request GWI pay the $406,852.00 it allegedly owes to the Authority and/or the State and requests that GWI be held liable for Plaintiffs' costs.

35-A M.R.S.A. § 9216 provides, in pertinent part, that any "entity that purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider is subject to the following broadband sustainability fees...." 35-A M.R.S.A. §9216(2). Thus, GWI's obligation to pay the BSF is a duty imposed by statute directly upon users of the Three Ring Binder. To the extent it is a tax rather than a fee, as GWI contends (and, for the reasons set forth below, the court agrees), it is a levy directly against users such as GWI. Maine Fiber's only role is to collect and remit the BSF, in the same way that the seller of merchandise subject to sales tax collects and remits the sales tax attributable to the sale. It may be that the Plaintiffs could have proceeded against Maine Fiber for failing to collect the BSF from GWI, but that possibility does not preclude the Plaintiffs from proceeding directly against GWI, the party statutorily obligated to pay the BSF.

The State of Maine clearly has standing to collect any tax from the person who owes it, and the statute's broad grant of power to the Authority confers standing on the authority as well:

> In order to carry out the purposes of this chapter, the authority has the following powers with respect to a project together with all powers incidental to or necessary for the performance of these powers:
>
> 1. Power to sue and be sued. To sue or initiate or appear in any proceeding...
>
> 20. All acts granted or implied. To do any act necessary or convenient to exercise the powers granted in this chapter or reasonably implied by this chapter.

35-A M.R.S.A. § 9205.

17

Alternatively, the Authority is entitled to collect the BSF from GWI as a third-party beneficiary under the July 16, 2010 DFUA and the Dark Fiber Settlement. In order to prevail on a third-party beneficiary contract claim, the beneficiary must "demonstrate that the promisee, [GWI], intended to give the plaintiffs the benefit of the performance." *F.O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 469 (Me. 1992); *see also Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 12, 26 A.3d 787. In *Bailey*, the Law Court quoted with approval section 302 of the Restatement (Second) of Contracts, which provides "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance"). *F.O. Bailey Co.*, 603 A.2d at 469. The court further noted that "[s]uch an intention is gathered from the language of the written instruments and the circumstances under which they were executed." (citation omitted). *Id.*

"When contract language is ambiguous or uncertain, its interpretation is a question of fact to be determined by the factfinder, but when the language is clear, it is a question of law and can be resolved by the court." *Id.* (citations omitted).

The July 16, 2010 DFUA and May 30, 2014 DFUSA both provide that GWI "shall be responsible for any taxes or fees" including the BSF. Joint Ex. 10 at 7 §5; Pl.'s Ex. 35 at 9 §5. These provisions, in light of Maine Fiber's statutory duty to collect and remit the BSF, clearly intend to give Plaintiffs the benefit of GWI's contractual obligation to pay the BSF to Maine

18

Fiber. 35-A M.R.S.A. § 6216(3). Accordingly, the Authority has standing to collect the BSF from GWI as a third-party beneficiary.[5]

In sum, the court concludes that the Plaintiffs have standing to enforce, by means of this collection action, violations of the statute mandating payment of the BSF, and, alternatively, that the Authority has standing as a third-party beneficiary of GWI's contractual agreement to pay the BSF.

B.  Whether the BSF Violates GWI's Right to Equal Protection

GWI contends that the BSF statute violates its right of equal protection because it does not treat all users of dark fiber in Maine equally. GWI is correct in asserting that not every user of dark fiber in Maine is required to pay the BSF. However, the State responds by saying that the relevant class is not users of dark fiber in Maine, but rather users of the Three Ring Binder dark fiber. Because the BSF statute treats all users of the Three Ring Binder equally, the State contends there is no equal protection violation.

To determine whether a statute violates the equal protection clause, the court employs a two-step test:

> First, the party challenging the statute must show that similarly situated persons are not treated equally under the law. Where this step is met, the Court must then determine what level of scrutiny to apply.

*Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065.

"All legislative enactments are presumed constitutional, and the party challenging the constitutionality of a statute bears the burden of proof." *Aseptic Packaging Council v. State*, 637 A.2d 457, 459-60 (Me. 1994). "A statute's unconstitutionality must be established to such a

---

[5] While GWI is correct that Plaintiffs did not explicitly raise the third-party beneficiary argument in their pleadings or pretrial statement of factual and legal issues, the court concludes that Plaintiffs did not waive this argument in light of the limited pre-trial record, the clear undisputed evidence, and GWI's awareness and ability to respond to this argument at trial. Plaintiffs' third-party beneficiary argument is based simply on the language of the statute and the DFUAs admitted into evidence.

degree of certainty as to leave no room for reasonable doubt." *Id.* at 459. Although legislative enactments are generally presumed to be constitutional, "the presumption of validity is not absolute." *McNicholas v. York Beach Village Corp.*, 394 A.2d 264, 269 (Me. 1978).

1. *Whether GWI has Shown that Similarly Situated Persons are not Treated Equally*

GWI's equal protection claim is based on the Legislature's decision to impose the BSF only on entities using Maine Fiber's "federally supported dark fiber" and not on entities using dark fiber that is not part of the Three Ring Binder. GWI asserts that it has a "class of one" equal protection claim based on the BSF's applicability to one specific grant-funded project, while allowing hundreds of other grant-funded projects with the same objectives to go unassessed.

Plaintiffs contend that GWI has not shown that entities situated similarly to GWI are treated differently under section 9216, because any other entity that wishes to purchase, lease, or obtain federally supported dark fiber would also be subject to the BSF. As Plaintiffs point out, Maine Fiber is the entity that is treated differently under section 9216 as it is the only purveyor of dark fiber that must collect the BSF from entities that elect to purchase, lease, or obtain federally supported dark fiber from it. Thus, Plaintiffs contend GWI lacks standing to make an equal protection argument that is Maine Fiber's to make.

However, the very statutory provisions that the court has decided grant standing to the Plaintiffs to pursue this collection action directly against GWI --the provisions imposing upon users of the Three Ring Binder dark fiber an explicit duty to pay the BSF for remittance to the Authority—also confer standing upon GWI, as a user obligated by the statute to pay the BSF. Furthermore, the court agrees with GWI that the appropriate class for equal protection purposes consists of all users of dark fiber in Maine, not just the users who obtain dark fiber from Maine Fiber. The BSF provision discriminates between the users of Maine Fiber's fiber

20

and the users of other providers' dark fiber. However, because the Three Ring Binder is unique in Maine, in being, as far as the evidence shows, the largest—if not the only—broadband network created from scratch rather than developed by an existing ILEC—and by far the largest broadband project subsidized by taxpayer funds. In these material respects, the Three Ring Binder is not similarly situated to any other broadband network in Maine, and its users are therefore not similarly situated to the users of any other broadband network. Specifically, the magnitude of the taxpayer subsidy benefiting the users of the Three Ring Binder sets them apart from users of other broadband in Maine. Other broadband has been funded from taxpayer subsidies but not at the level or scale of the Three Ring Binder.

The court therefore finds and concludes that the Defendant has not established that the users of the Three Ring Binder are similarly situated to users of other broadband, for purposes of the Defendant's equal protection claim.

Although this finding and conclusion could obviate further analysis of the Defendant's equal protection claim, the court will also address the question whether the discrimination between users of the Three Ring Binder and the users of other broadband in Maine can be justified in terms of being rationally related to a legitimate state interest.

2. *Whether the Imposition of the BSF Only Upon Users of the Three Ring Binder is Rationally Related to a Legitimate State Interest*

Where a statute is challenged on equal protection grounds and does not deal with a fundamental right or a suspect class such as race, religion, or national origin, the court applies a "rational relationship" test. *Beaulieu v. City of Lewiston*, 440 A.2d 334, 338 (Me. 1982) ("It is clear that governmental efforts to alleviate social and economic problems may draw constitutionally sound distinctions among beneficiaries if the dissimilar treatment is rationally related to the objectives of those efforts"). 35-A M.R.S.A. § 9216 involves neither a fundamental right nor a suspect class. "Thus it will survive an equal protection challenge if its

21

classifications are rationally related to some legitimate governmental purpose." *Aseptic Packaging Council*, 637 A.2d at 459.

When, as is the case here, no fundamental right or suspect classification is involved, the party challenging the validity of a statute has the burden to show that "no facts exist upon which a rational basis supporting th[e] statute could be found." *State v. Haskell*, 2008 ME 82, ¶ 8, 955 A.2d 737, 740.

"A party alleging that a legislative classification violates equal protection must show by clear and irrefutable evidence its arbitrariness and irrationally discriminatory nature." *Aseptic Packaging Council*, 637 A.2d at 459. "[T]he rationality of a statute is not determined solely by looking to the legislative statement of fact. Instead, [the court] consider[s] whether any conceivable state of facts either known, or which can reasonably be assumed, supports the legislative action." *Aseptic Packaging Council*, 637 A.2d at 459. "The State has no burden to come forward with such 'conceivable facts,' but rather, it is the contestant who retains the burden of proving that no conceivable state of facts exists." *Id.* at 460.

GWI argues that section 9216 is not rationally related to a legitimate governmental interest because it was created in order to reach a compromise in the face of FairPoint's opposition to the Three Ring Binder Project. GWI contends that the BSF is arbitrary because it targets a class that contributes to ameliorating a perceived harm—lack of high speed broadband in rural areas of Maine—rather than targeting a class that contributes to the perceived harm. However, whether or not these were the Legislature's actual reasons for enacting the BSF is beside the point—as noted above, the question is whether GWI can overcome the presumption of constitutionality by establishing that there is no set of facts that can furnish a rational basis for the imposition of the BSF.

22

Plaintiffs contend that the imposition of the BSF on users of the Three Ring Binder is rationally related to at least two legitimate governmental interests including: 1) the desire to balance a perceived competitive advantage that could permit CLECs to undercut prices charged by ILECs for telecommunications services; and 2) providing funds to encourage ILECs to deploy broadband infrastructure in unserved areas within their service territories. The court agrees with Plaintiffs that both of these are legitimate governmental interests, and that the BSF is rationally related to both

Thanks to the federal subsidy, Maine Fiber's rates per strand mile were significantly less than rates charged by FairPoint, the only other significant provider of dark fiber in Maine. The Legislature could rationally have decided that the competitive rates enjoyed by users of the Three Ring Binder as a result of the federal subsidy justified imposition of the BSF. Also, given that the very purpose of LD 1778 was to enable the Three Ring Binder's dark fiber and related equipment to be installed on the utility poles owned by FairPoint and other ILECs, the Legislature could rationally have decided that a portion of the fee could be applied to enable FairPoint and other ILECs to expand their broadband networks.

Decisions in other jurisdictions make it clear that offsetting a competitive advantage—especially one resulting from taxpayer subsidies—can serve as a rational basis for differential treatment of taxpayers. *See Qwest Corp. v. Iowa State Bd. of Tax Review*, 829 N.W.2d 550, 562 (Ia. 2013) ("The legislature could have rationally believed that the ILECs had a powerful built-in competitive advantage based on their existing facilities, whose development had been underwritten by Iowa ratepayers over the past century"); *Verizon New Jersey Inc. v. Hopewell Borough*, 26 N.J. Tax 400, 428, 2012 N.J. Tax LEXIS 10 *46 (Tax Ct. 2012) ("[T]here was a rational basis to continue to impose the personal property tax only on those local telephone

23

companies that had, for many years, enjoyed a monopoly over the provision of local telephone service in their franchise areas").[6]

In addition, section 9216 and the BSF are rationally related to the legitimate governmental interest of encouraging ILECs to deploy broadband infrastructure in unserved areas within their service territories. While GWI contends that charging the BSF undermines the goal of expanding broadband infrastructure by taking money from CLEC users of the Three Ring Binder that they could use to expand their own networks, Metcalfe's Law suggests that any expansion of the broadband network benefits CLECs as well as the ILECs directly benefited by the Broadband Sustainability Fund.

Thus, there are several states of fact that supply a rational basis for the imposition of the BSF upon users of the Three Ring Binder. The court concludes that GWI has not met its burden of persuasion on its equal protection claim.

C. Whether section 9216 Violates GWI's Right to Due Process

In order to successfully challenge the constitutionality of a statute on due process grounds, "a party must establish the complete absence of any set of facts that would support the need for its enactment." *Aseptic Packaging Council*, 637 A.2d at 461 (quoting *State v. Eaton*, 577 A.2d 1162, 1165-66 (Me. 1990). "[T]he requirements of due process in the exercise of the State's police power [are] as follows:

1. The *object* of the exercise must be to provide for the public welfare.
2. The legislative *means* employed must be appropriate to the achievement of the ends sought. [and]
3. The *manner of exercising* the power must not be unduly arbitrary or capricious."

---

[6] The New Jersey Tax Court opinion in *Verizon New Jersey* notes that a tax differential based on mitigating a taxpayer-subsidized competitive advantage is justified only for as long as the competitive advantage lasts. *See* 26 N.J. Tax at 428, 2012 N.J. Tax LEXIS 10 at *46. In that regard, it is noteworthy that the Maine Legislature saw fit to repeal the BSF in 2015. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015).

*Id.* (quotations omitted) (emphases in original).

"A substantive due process analysis focuses on the rationality of the enactment, that is, on whether the regulation at issue is in the interest of the public welfare and whether the methods used bear a rational relationship to its intended goals." *Nugent v. Town of Camden*, 710 A.2d 245, 249 (Me. 1998). Courts applying the rational basis standard will not set aside even a discriminatory statutory scheme if "any state of facts reasonably may be conceived to justify it." *Bowen v. Gilliard*, 483 U.S. 587, 600-01 (1987) (internal citation omitted).

GWI contends the BSF does not satisfy the due process test facially or as applied. It contends that the BSF is not an appropriate or effective method of providing funds to expand broadband to unserved areas because it is levied against entities that are attempting to carry out that very objective, and it inhibits their ability to do so. As the BSF is applied, GWI contends that the BSF requires an entity purchasing or leasing dark fiber from the Three Ring Binder to charge its end users more money, thereby undermining the objectives of the BSF.

Plaintiffs assert, and the court agrees, that the Legislature could rationally have determined that imposing the BSF on users of the Three Ring Binder in order to promote the deployment of broadband infrastructure in unserved areas serves the public interest. Also, Plaintiffs assert, and the court agrees, that the Legislature could rationally have viewed the BSF as promoting competition among dark fiber providers by mitigating the taxpayer-subsidized competitive advantage that the Three Ring Binder enjoyed through offering lower user rates.

Thus, the court rejects GWI's due process challenge for essentially same reasons as its equal protection claim. The BSF and section 9216 were enacted with the aim of

25

expanding broadband to unserved or underserved territories. This was carried out by imposing the BSF on entities that purchased, leased, or obtained federally supported dark fiber from the Three Ring Binder and providing ILECs a right of first refusal to request that money in order to deploy broadband infrastructure in unserved areas within their territory.

While reasonable minds might debate the merits of this approach, the court concludes that it was not "unduly arbitrary or capricious" as it advances the valid public purpose of expanding broadband infrastructure to unserved areas.

D. Whether the BSF is a Fee or a Tax

GWI also contends that the BSF is a property tax that violates the Maine Constitution because it is not equally applied and is not based on the value of the taxed property. *See* ME. CONST. art. IX, § 8. It is undisputed that the BSF is not apportioned and assessed equally and is not based on value; it applies only to "an entity that purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider." 35-A M.R.S. § 9216.

Plaintiffs respond by contending that the BSF is, as the name suggests, a fee and not a tax. In the alternative, they contend that, even if the BSF is deemed a tax, it must be deemed an excise tax rather than a property tax, and that it is valid because excise taxes are outside the scope of the Article IX, section 8 constitutional provision that GWI's argument rests upon.

The analysis begins with 1) whether the BSF is a tax or fee, and then turns to 2) if the BSF is a tax, whether it is an excise tax or a property tax. In addressing these issues, the court looks beyond the label attached by the Legislature to the true nature of the assessment. *E.g. United States v. Maine*, 524 F. Supp. 1056, 1059 (D. Me. 1981).[7]

---

[7] This court "must regard things rather than names," *Pace v. Burgess*, 92 U.S. 372, 376 (1875), and so must analyze the nature of the assessment to determine whether it is indeed a fee or is in fact a tax.

The distinction between a tax and a fee "is one of purpose and of degree of particularity." *Butler v. Supreme Judicial Court*, 611 A.2d 987, 990 (Me. 1992).

In determining whether an assessment is a fee or a tax, the court analyzes: (1) whether the primary purpose is to raise revenue; (2) whether the assessment is "paid in exchange for exclusive benefits not received by the general public"; (3) whether the assessment is voluntary; and (4) whether the assessment is "a fair approximation of the cost to the government and the benefit to the individual of the services provided." *City of Lewiston v. Gladu*, 2012 ME 42, ¶9, 40 A.3d 964 (quoting *Butler*, 611 A.2d at 990).

The test indicates an assessment is a tax if: (1) the assessment's primary purpose is to raise revenue, as opposed to furthering a regulatory purpose; (2) the assessment is paid in exchange for benefits enjoyed by the general public, as opposed to benefits exclusive to those assessed; (3) the assessment cannot be avoided by the subject; and (4) the assessment does not fairly approximate the cost to the government and benefit conferred to the user. *See id.* ¶¶ 13-26.

The four-part test is similar to those used in other jurisdictions. *Id.* (citing *Church of Peace v. City of Rock Island*, 828 N.E.2d 1282, 1284 (Ill. App. Ct. 2005) (listing regulatory purpose, proportionality to the cost of the service, and voluntariness as the three requirements for a stormwater service charge to be a fee and not a tax); *Long Run Baptist Ass'n v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 775 S.W.2d 520, 522 (Ky. Ct. App. 1989) ("A tax is universally defined as an enforced contribution to provide for the support of government, whereas a fee is a charge for a particular service"). "Although some jurisdictions have held that the benefits must be direct and exclusive . . . the trend seems to be in favor of upholding fees that confer intangible benefits on both those who are assessed and those who are not." *Id.* (quoting Avi

27

Brisman, *Considerations in Establishing a Stormwater Utility*, 26 S. Ill. U. L.J. 505, 521-22 (2002) (cited with approval in *McLeod v. Columbia City*, 599 S.E.2d 152, 155 (Ga. 2004)).

1. *Whether the Assessment's Primary Purpose is to Raise Revenue or to Further a Regulatory Purpose*

Under the statute, 95% of the BSF funds remitted to the Authority were to be deposited into the Broadband Sustainability Fund and made available, through a right of first refusal, to ILECs who filed a request and certification that the funds "will be used to deploy broadband infrastructure in unserved areas within the carrier's service territory." 35-A M.R.S.A. § 9216(6)(B). The remaining 5% of BSF funds, along with any portions of the Broadband Sustainability Fund not requested and utilized by ILECs, were to be transferred to the ConnectME Fund. *Id.* at §9216(6)(D).

GWI contends the BSF is designed to raise revenue for the Broadband Sustainability Fund, which is analogous to the common practice of earmarking certain tax revenue for a particular purpose. Accordingly, GWI argues the BSF is a tax, even though it is designed to provide service in unserved areas. Plaintiffs contend that the primary purpose of the BSF is to further the regulatory purpose of deploying broadband infrastructure in unserved areas in Maine.

Because nearly all of the BSF funds are made available to ILECS, the court determines that the first factor indicates the BSF is a fee intended to promote the regulatory purpose of developing broadband infrastructure in unserved areas within an ILEC's service territory. The present situation is analogous to *Tukwila School District No. 406 v. City of Tukwila*, relied upon by *Gladu*, in which a stormwater fee met the regulatory-purpose requirement when it was enacted to provide revenue to—among other things—construct, reconstruct, and improve facilities and activities in furtherance of a storm water utility plan. 167 P.2d 1167, 1172 (Wash. Ct. App. 2007) (discussed by *Gladu*, 2012 ME 42, ¶15, 40 A.3d 964).

28

While the BSF is intended to raise revenue, the revenue is required to be utilized in furtherance of a specific regulatory purpose. The fact that section 9216 utilizes ILECs to accomplish the regulatory goal does not transform the BSF into a revenue raising mechanism.

2. *Whether There is a Direct Relationship Between the BSF and the Benefit Conferred Thereby*

The funds raised through the BSF are either utilized by ILECs to deploy broadband infrastructure in unserved areas or, if not requested and granted to an ILEC, transferred into the ConnectME fund.

GWI argues that there is no direct relationship because the only benefit to GWI, if any, is based on benefits under Metcalfe's Law, which benefits everyone in the world connected to the Internet. Plaintiffs contend there is a close relationship because disbursements from the Broadband Sustainability Fund will benefit individuals seeking better Internet service within any given ILEC's service area, and will benefit others that purchase, lease, or obtain dark fiber from the Three Ring Binder—such as GWI—by providing more potential customers, expanding the network for existing customers, and making the communications network in Maine more valuable.

In *Gladu*, the Law Court recognized a trend "in favor of upholding fees that confer intangible benefits on those who are assessed and those who are not." 2012 ME 42, ¶ 15, 40 A.3d 964. Based on that trend, *Gladu* determined that an assessment applicable to developed properties that receive the special benefit of having their stormwater managed in an effort to comply with state and federal laws favored upholding the stormwater fee. *Id.* ¶ 20.

Here, while GWI does not receive as direct a benefit from the BSF as the ILECs who can request the use of funds from the Broadband Sustainability Fund, Metcalfe's Law teaches that all users of the Internet benefit from expansion. The court concludes that the BSF's

29

purpose of expanding of the dark fiber network constitutes a benefit to users of the Three Ring Binder, albeit an intangible one, that satisfies the broad standard set forth in *Gladu*.

### 3. *Whether The BSF is Voluntary*

The BSF is imposed on any entity that "purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider...." 35-A M.R.S.A. § 9216(2). Dark fiber is available for purchase or lease from dark fiber providers not supported by federal funds. (*See e.g.* Stip. ¶37.)

GWI argues that there is no way for it to avoid the BSF once it utilizes federally supported dark fiber. GWI contends that the focus should not be on whether an entity can avoid a fee by "choosing not to utilize the service" offered by the government. Instead, the court should determine whether there is a way to avoid paying the BSF once federally supported dark fiber is purchased, leased, or otherwise obtained. Plaintiffs contend that GWI was not compelled to use the Three Ring Binder and, thus, its payment of the BSF is voluntary.

In *Gladu*, the Law Court determined that a stormwater fee was voluntary because those assessed the fee could undertake certain efforts to avoid the fee, even though the cost of undertaking said efforts could be "quite high." 2012 ME 42, ¶¶22-23, 40 A.3d 964. On the other hand, the court emphasized the fact that the ordinance at issue included a 100% fee credit, and specifically declined to "consider whether a fee is voluntary if the applicable ordinance does not include a 100% fee credit." *Id.* at ¶23, 40 A.3d 964. Thus, *Gladu* can be read to indicate that the means of avoiding the assessment at issue needs to be found within the regulatory scheme itself.

On the one hand, the use of federally supported dark fiber is voluntary. Indeed, the present case presents a clearer example of voluntary action than *Gladu* because GWI affirmatively chose to engage in the activity at issue with full knowledge that it would incur the

30

BSF and could avoid the BSF by purchasing dark fiber from sources not supported by federal funding. On the other hand, the Broadband Sustainability Act contains no fee credit or other means of avoiding the BSF that would align the Act with the ordinance at issue in *Gladu*. The voluntariness factor is neutral for purposes of this analysis.

### 4. *Whether The BSF Constitutes a Fair Approximation of the Cost to the Government and Benefit to the Entity Subjected to the Assessment*

The statute provides for 95% of the BSF to be deposited in the Broadband Sustainability Fund and made available to ILECs to deploy broadband infrastructure in unserved areas within their service territory. 35-A M.R.S.A. §§ 9216(4), (6)(B). The remaining 5% is deposited into the ConnectME Fund, to support the activities of the Authority to implement section 9216 and generally further the deployment of broadband infrastructure in unserved areas in Maine. *Id.* at § 9216(4)(B); 35-A M.R.S.A. § 9204 (2010).

GWI argues that the BSF is not a fair approximation of the cost to the government and the benefit conferred to GWI because the only cost the State incurs is administering the program and the only benefit GWI receives are the very indirect benefits under Metcalfe's Law. Plaintiffs do not seriously challenge this contention, and instead emphasize that the assessment need only be a fair approximation, and that an assessment can still be a fee when it exceeds the government's costs.

Here, the fourth factor strongly indicates the BSF is a tax, not a fee. This is because only 5% of the funds received from the BSF are utilized by the Authority to defray the costs associated with the Broadband Sustainability Act. Admittedly, Metcalfe's Law indicates that the remaining 95% of the BSF redounds to the benefit of GWI and other users of the Three Ring Binder by supporting an expansion of the broadband network, but there is absolutely no evidence that this intangible, unmeasurable benefit has any particular relation to the BSF.

31

Balanced together, the four factors indicate that the BSF is a tax, not a fee. While the first two factors point in the direction of the BSF being a fee and the third is neutral, the fourth factor points so strongly against the BSF being a fee that it compels the conclusion that the BSF is a tax.

E. Whether the BSF is a Property Tax or Excise Tax

GWI contends that, if the BSF is indeed a tax, it is a property tax that violates Article IX, section 8 of the Maine Constitution, because it is not equally applied to all users of dark fiber and also because it is not based on the just value of the property, i.e., the dark fiber. GWI argues that the BSF is a property tax because it focuses on how much dark fiber an entity purchases, leases, or obtains without regard to the use made of the dark fiber. Indeed, GWI contends that the BSF applies regardless of whether the dark fiber is utilized by the purchasing or leasing entity. The Plaintiffs respond that Article IX, section 8 applies only to property taxes, not excise taxes, and that, even if the BSF is a tax, it is not a property tax.

Article IX, section 8 provides in pertinent part that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." ME. CONST. Art. IX, § 8. "This constitutional provision establishes two requirements for a valid property tax: a valuation requirement and an apportionment requirement." *Eastler v. State Tax Assessor*, 499 A.2d 921, 924 (Me. 1985).

Under the valuation requirement, the tax-levying authority must determine the market value of the property. *Id.* (citation omitted). Under the apportionment requirement, the taxing authority must apportion the tax equally according to the market value. *Id.* "The purpose of the two constitutional requirements is to equalize public burdens so that a taxpayer contributes to the entire tax burden in proportion to his share of the total value of all property subject to the tax." *Id.* (citation omitted).

32

Taxes on businesses, or excise taxes, however, are not limited by the Maine Constitution so long as the tax is for a public purpose and assessed uniformly upon all businesses of a like kind. *Id.* at 924 (citations omitted). Stated differently, "[a] property tax is levied on the ownership of property, while an excise tax may only be levied on a use of the property." *Id.* (citations omitted).

Determining whether a purported excise tax is a property tax "becomes difficult . . . when the amount of the purported excise tax is measured by the property in the hands of the tax payer." *Id.* To make this distinction, the court applies a two-part test "looking to the subject matter of the tax and examining the method of taxation not as an independent factor but as a key to determining what was in fact the subject matter." *Id.* at 925 (citations omitted). "The central issue in the determination of the nature of the tax is the subject matter of the tax. We examine the characteristics as a key to ascertaining what is in fact the subject matter of the tax." *Opinion of Justices of Supreme Judicial Court,* 501 A.2d 16, 20 (Me. 1985) (citing *Eastler,* 499 A.2d at 925).

In *State v. Western Union Tel. Co.,* the Law Court employed the two-part test to determine that a 2-1/2 percent tax on the value of telegraph company equipment was an excise tax, not property tax. 73 Me. 518, 525-29 (Me. 1882); *see also Eastler,* 499 A.2d at 924-25 (discussing *Western Union*). *Western Union* explained that, although the method for establishing the tax rate at issue was based on the total valuation of property, that valuation was in fact a measure of the value of the business. *Id.* at 527, 531; *see also Eastler,* 499 A.2d at 925. Furthermore, *Western Union* determined that the tax acted upon property that was used in the telegraph business only while the property was in use for the business. *Id.* Accordingly, *Western Union* determined that the tax was imposed against, not the property of the telegraph

33

company as such, but against the franchise or business, and therefore was not subject to Article IX, section 8 of the Maine Constitution. *Id.* at 530-31; *see also Eastler*, 499 A.2d at 495.

In *Eastler*, the Law Court determined that a tax funding the cost of forest control through three sources was an unconstitutional property tax. *Id.* at 923. The three sources were: 1) municipalities and unorganized territories paying an initial amount up to a limit based on a percentage of valuation; 2) the State's general fund; and 3) a per acre tax on land protected by the forest control. *Id.* The State's general fund and the per acre tax on protected land split the remainder of the cost needed after collecting from the municipalities and unorganized territories. *Id.* In addition, each owner of protected land was entitled to an exemption of 500 acres of land in each municipality or unorganized territory. *Id.* The single issue posed in *Eastler* was whether the tax was a property tax "because it impose[d] a tax on ownership of property that [wa]s not apportioned according to the value of the land," or whether it was an excise tax because it was "imposed on the commercial use of property...." *Id.*

In concluding the forest tax was a property tax, *Eastler* explained that the method of rate determination—dividing one-half of the total state fire suppression cost by the acreage of the protected land—was commonly utilized in property taxes and that enforcement of the statute through a direct lien upon real estate further supported this conclusion. *Id.* at 925 (citations omitted). More importantly, *Eastler* determined that the tax was imposed based on the ownership of land, and not on land operated in a particular business. *Id.* (citations omitted). While the defendants argued that the tax was levied on the commercial forest industry, the court concluded that the statute's legislative history did not reveal this focus, the statute's language did not address commercial forestry, the tax was not limited to land used in commercial forestry, and the statute's benefits were not dedicated to the needs of the commercial forest industry. *Id.* at 925-27.

34

Here, the BSF imposes an assessment based on the number of miles of federally supported dark fiber strand purchased, leased, or used by an entity. 35-A M.R.S.A. § 9216(2). Although the method of taxation focuses on the amount of property owned or utilized by the taxpayers, excise taxes on business are frequently measured in this manner. *Eastler*, 499 A.2d at 925 (citing *Western Union*, 73 Me. 518). The excise tax imposed per gallon of gasoline purchased in Maine furnishes one example. Accordingly, the court turns its analysis to the subject matter of the tax.

The BSF is analogous to the excise tax in *Western Union* and is readily distinguishable from the property tax in *Eastler*. Similar to *Western Union*, the BSF is a tax on equipment utilized by telecommunications service providers in the course of their business. GWI contends that the BSF must be deemed a property tax because it is not limited to utilization of dark fiber and extends to the purchase or lease of dark fiber. GWI contends an entity could purchase dark fiber from Maine Fiber and choose not to utilize it. But the same objection can be made to any valid excise or use tax. The excise tax on gasoline, for example, is based on the purchase of gasoline regardless of whether the purchaser uses it or stores it.

In 1923, the Supreme Judicial Court of Maine addressed the Legislature's questions about its authority to impose an excise tax on sale of gasoline: " . . . it is not the value of the gasoline and fuel as property owned which is the subject of taxation but the sale of and dealing in the article whatever its value. The tax is measured not by the worth of the commodities but by the amount of business transacted in dealing with them computed by gallons, and this fits the definition of an excise tax which is: a tax imposed upon the performance of an act, the engaging in an occupation or the enjoyment of a privilege." *See Questions Submitted by the House of Representatives to the Justices of the Supreme Judicial Court*, 123 Me. 573, 1923 Me. LEXIS 274 at *6-7, *quoting* 26 R. C. L., Page 236 (internal quotation marks omitted).

35

The BSF is essentially a tax on entities "dealing with the article," to quote the just-cited opinion. The amount of the BSF is based on the number of strand-miles utilized or leased or purchased, not on the value of the strands. The problem with the forestland tax in *Eastler* is that it applied to any undeveloped land, and not just to land used in commercial forestry. The BSF suffers from no such deficiency. Unlike the undeveloped land at issue in *Eastler*, there is absolutely no evidence that the Three Ring Binder dark fiber is purchased or leased for investment or for any other purpose than to be used by telecommunications service providers such as GWI to transmit data. In contrast to the forestland tax in *Eastler*, but like an excise tax per gallon of gasoline, the BSF is an excise tax on the use of property.

F. Whether the Fact that the BSF Is Imposed Only On The Three Ring Binder And Its Users Affects Its Validity

One of GWI's primary arguments is that the BSF is invalid because it applies only to the Three Ring Binder and its users. Much of the dialogue at the December 16, 2016 oral argument focused on this issue.

GWI's position, claiming support from the Law Court decision in *Western Union, supra*, is that an excise tax is valid only if it is imposed uniformly on all businesses of a like kind. *See Western Union, supra*, 73 Me. at 526-27 ("The uniformity required in a tax upon use or business is satisfied by its being assessed upon all business of a like kind.")

At oral argument, counsel for GWI acknowledged that the requirement of equal apportionment and assessment applicable to property taxes by virtue of Article IX, section 8, of the Maine Constitution does not apply to excise taxes. In *State v. Stinson Canning Company*, the Law Court said as much: "It is generally held that a constitutional provision requiring taxation to be equal and uniform applies only to taxes on polls and property and has no reference whatever to excises." 161 Me. 320, 325-26, 211 A.2d 553, 556 (1965). Citing its opinion in *Western Union*, the court observed, "[Our] Constitution contains no provision limiting the

36

legislative imposition of excise taxes or, to use the language of the Court: Our Constitution imposes no restrictions upon the Legislature in imposing taxes upon business." *Id.*, 161 Me. at 326, 211 A.2d at 556.

If the uniformity requirement for an excise tax is not rooted in the property tax provision of the Maine Constitution, *see* ME. CONST., art. IX, §8, the only other basis for it must be the constitutional right of equal protection. This conclusion is confirmed in an Opinion of the Justices on the validity of an excise tax that addresses the uniformity requirement in terms of an equal protection analysis under Article I, section 6-A of the Maine Constitution. *See Opinion of the Justices*, 335 A.2d 904, 912-13 (Me. 1975)

It follows that "like kind" issue raised by GWI is to be resolved using the highly deferential standard of review applicable to equal protection issues. In *Stinson Canning, the* Law Court emphasized that very point:

> It is to be presumed [ ] that when the legislature levies a tax and appropriates the proceeds thereof for a purpose which is declared to be for the public welfare that it has acted in good faith and within its constitutional powers. Unless it has clearly exceeded its constitutional powers in so doing, its action must be sustained. All rational doubts as to the constitutionality of statutes must be resolved in favor of the constitutionality thereof. Although it is the duty of the court to declare acts which transcend the powers of the legislature void, this judicial duty is one of gravity and delicacy and it is only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute that the inherent power of the court to declare statutes unconstitutional should be exercised.

161 Me. at 325, 211 A.2d at 556, *quoting State v. F. H. Vahlsing, Inc.*, 147 Me. 417, 430, 88 A.2d 144 (1952).

Here, for all of the reasons discussed above in the context of GWI's equal protection claim, the Legislature rationally could have decided that the Three Ring Binder was sufficiently distinct from other broadband networks by virtue of its size, the extent of taxpayer subsidies and its competitive advantages to justify imposing the BSF only upon users of the Three Ring

37

Binder, and not on the users of other broadband networks. Accordingly, the court concludes that the BSF is a valid excise tax imposed on the use of property utilized primarily, if not exclusively, for business purposes. Because the court agrees with the substance of Plaintiffs' arguments, it need not and does not reach Plaintiffs' unclean hands defense.

### III.    Conclusion

Based on the entire record, the court enters judgment set forth below. In the court's view, because the BSF is a valid excise tax payable by statute to the ConnectME Authority, the action could have been brought in the name of either Plaintiff. Accordingly, the court grants judgment to both on the Complaint for a single amount.

IT IS HEREBY ORDERED, ADJUDGED AND DECLARED AS FOLLOWS:

1. Judgment on Plaintiffs' Complaint for Collection of Unpaid Fees is awarded to Plaintiffs ConnectME Authority and State of Maine jointly in the total amount of $406,852.00, plus pre-judgment and post-judgment interest and costs. Costs are awarded to Plaintiffs as prevailing parties.

2. Judgment on Defendant's Counterclaim for Declaratory Relief and Money Had and Received is awarded as follows:

    a. Judgment on Counts I, III and IV is awarded to Defendant to the extent of this Decision and Judgment, and is otherwise denied. It is hereby declared as follows: Plaintiffs have standing to collect the Broadband Sustainability Fee directly from Defendant pursuant to Chapter 93 of Title 35-A and as a third-party beneficiary to contracts between Defendant and Maine Fiber. The Broadband Sustainability Fee is a valid assessment in the nature of an excise tax that does not violate Defendant's rights to due process and equal protection, and that is rationally related to the legitimate State interest of

38

increasing broadband availability to unserved and underserved areas of Maine. Defendant is liable to Plaintiffs for the unpaid balance due from Defendant for the Broadband Sustainability Fee and Defendant is not entitled to return of the amounts already paid.

b. Judgment on Count II is awarded to Plaintiffs.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated December 20, 2016

A.M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 12.21.16
Copies sent via Mail ___ Electronically ✓

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Cumberland, ss

STATE OF MAINE & CONNECTME          )
AUTHORITY,                          )
                                    )
                    Plaintiffs      )
                                    )
        v.                          )
                                    )          Docket No.: BCD-CV-14-56 ✓
BIDDEFORD INTERNET                  )
CORPORATION d/b/a Great Works       )
Internet                            )
                                    )
                    Defendant       )

DECISION AND JUDGMENT

This case centers on the validity of an assessment imposed by Maine statute upon users

of a certain federally-subsidized broadband communications network. The State and the state

agency that is designated by statute to receive the assessment seek to collect unpaid amounts

from a user that challenges the assessment as an unconstitutional tax and also challenges the

Plaintiffs' standing.

The case came before the court for a jury-waived trial April 27-28, 2016. Both parties

presented evidence in the form of sworn testimony and exhibits. The trial was recorded. After

the trial, the parties filed proposed findings of fact and conclusions of law. Oral argument was

held August 1, 2016, at which point the court took the case under advisement.

Based on the entire record, the court adopts the findings of fact and conclusions of law

set forth below, and renders judgment as set forth below.

*I.        Background*

Plaintiff ConnectME Authority (the "Authority") is an agency of Plaintiff State of Maine

that was established "to stimulate investment in advanced communications technology

infrastructure in unserved or underserved areas" in Maine. 35-A M.R.S.A. § 9203(1) (2010). The Authority was also created to promote universal broadband service by maximizing federal and private resources to support the deployment of broadband infrastructure in unserved and underserved areas of the State. *Id.* (2015); 35-A M.R.S.A. § 9202-A (2015).

Broadband involves the transmission of data at high speeds, generally over the Internet, and it can be accomplished with both fiber optic and digital subscriber line ("DSL") technology. Stip. ¶ 3.[1] Among the currently available means of data transmission, fiber optic technology is the fastest means of transporting data between two points. *Id.* ¶ 5. Data transmission is via fiber optic cable, which is essentially a bundle of individual glass or plastic strands, each of which can be lit in order to transmit data by means of an associated light signal or light communication transmission. *Id.* ¶ 6. When a glass or plastic fiber optic strand is lit with a beam of light, the beam of light can carry coded information along the strand. *Id.* ¶ 4.

"Dark fiber" is the term applied to unlit fiber optic strands. Dark fiber providers-- owners of fiber optic cable networks—sell or lease strands of dark fiber to telecommunications service providers who use the strands to transmit data on behalf of their customers. *See id.*

Defendant Biddeford Internet Corporation is a Maine corporation located in Biddeford, Maine, that, at all relevant times, has offered telephone and Internet services to residential and business customers. *Id.* ¶ 1. Defendant does business under the names Great Works Internet and GWI and is referred to herein as "GWI." At all relevant times, GWI has provided broadband service to its residential and business customers using fiber optic strands and/or DSL. *Id.* ¶ 8.

GWI and telecommunications service providers like it are generally referred to as "CLECs" within the telecommunications industry, CLEC being the acronym for "competitive

---

[1] DSL is a different technology for bringing broadband to residences and businesses using ordinary copper telephone lines that have been specially conditioned. (Stip. ¶ 7.)

2

local exchange carrier." *Id.* ¶ 10. Under Title 35-A and the rules of the Maine Public Utilities Commission ("PUC"), a CLEC is any local exchange carrier that is not an "incumbent local exchange carrier," or, to use the acronym, an "ILEC." *Id.* An ILEC is defined by 35-A M.R.S.A. § 102(9-B) and 35-A M.R.S.A. § 9216(1)(B), in pertinent part, as "a telephone utility that provided single-party service, voice grade access to the public switched telephone network in a defined service territory in the State on February 8, 1997, or its successor," or that is "designated as an [ILEC] pursuant to 47 U.S.C. § 251(h(2)."

There are currently more than 20 ILECs operating in Maine, including FairPoint, which at all relevant times has provided telephone service for roughly 80% of the telephone service area in Maine. *Id.* ¶ 12.[2] The number of ILECs in Maine has stayed roughly the same since 2009. *Id.* There are currently more than 70 CLECs certified by the PUC, including GWI. *Id.* ¶ 13.

Telecommunications service providers in Maine often compete for telecommunications customers. *Id.* ¶ 17. FairPoint and GWI compete in Maine for residential and commercial telephone and Internet business.

At all relevant times, pursuant to the 1996 Federal Telecommunications Act and subsequent decisions of the Federal Communications Commission ("FCC") and the Federal Courts, FairPoint has been required to make some of its "unbundled network elements" ("UNEs") available to GWI and other CLECs at what are called TELRIC prices that have been approved by the Maine PUC. *Id.* ¶ 14; *see also Verizon New England, Inc. v. Maine Pub. Utils. Comm'n,* 509 F.3d 1, 4-6 (1st Cir. 2007). TELRIC, which refers to a cost methodology required to be used by the FCC under certain circumstances, is short for the "total element long-run

---

[2] FairPoint has been a subsidiary of FairPoint Communications, Inc., at all relevant times. Trial Transcript Vol. II (Tr. II): 62-63. FairPoint is one the entities resulting from the 2008 merger between FairPoint affiliates and Verizon New England, Inc., and its affiliates. *Id.*

incremental cost" to FairPoint for a given UNE. (Stip. ¶ 15.) TELRIC prices are "highly favorable" to FairPoint's competitors. *See e.g. Verizon New England, Inc.*, 509 F.3d at 5 (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 374 (1999).

A. The Authority and the ConnectME Fund

The Legislature established the ConnectME Fund in 2006 as a "non-lapsing fund administered by the Authority for the purposes of supporting the activities and projects of the Authority under [Chapter 93 of Title 35-A]." 35-A M.R.S.A. § 9211(1). The ConnectME Fund is intended to be funded through an assessment on communications services providers in the State of Maine on a competitively neutral basis. *Id.* § 9211(2). According to Phillip Linley, executive director of the Authority and a State's witness at the trial, the ConnectME Fund is one source of funds for the Authority's activities and projects, but not the only source of funds. Trial Transcript Vol. I (Tr. I): 46-47 (testimony of Phillip Linley). The Authority's activities and projects are also supported by the Broadband Sustainability Fund, *see infra*, and federal grants. *Id.; see also* 35-A M.R.S.A. § 9216(5)-(6) (2010).

The Authority has awarded approximately $9.8 million in grants from the ConnectME Fund to promote the construction of telecommunications infrastructure in unserved areas of the State. Tr. I: 48-49 (Linley); Pl.s' Ex. 19. These grants have benefited the recipients thereof and those who live in the formerly unserved areas. Tr. I: 49-51 (Linley).

B. The 2009 Federal Grant

In 2009, private telecommunications services providers began meeting with representatives of the State, including Mr. Linley, to address the lack of middle-mile broadband capacity in Maine. Tr. I: 86 (Linley). Middle-mile broadband is akin to an interstate highway; it traverses the whole state and has connections that can be likened to an interstate highway's off ramps to "last-mile broadband." *Id.* at 52-53 (Linley). Last-mile broadband is analogous to

4

local roads off an interstate highway—last-mile broadband connects to the homes and places of business of individual customers. *See id.*

As of 2009, FairPoint was the primary dark fiber provider in Maine—it owned and operated nearly all of the middle-mile fiber optic cable network in Maine, which served only a limited portion of the State. During 2009, the aforementioned group developed a projected route for a new middle-mile fiber optic cable line project to be located in unserved areas in Maine, and coined a name for the project, the "Three Ring Binder." *See id.*

The Three Ring Binder was intended to serve as the broadband equivalent of an interstate highway through rural parts in Maine. *See id.* According to the testimony of Fletcher Kittredge, chief executive officer of GWI, a major benefit of the middle-mile dark fiber that the Three Ring Binder would make available to CLECs such as GWI is that they could connect to it at any point. In this regard, it differed from the existing middle-mile dark fiber available from FairPoint, which generally could only be accessed by connecting to FairPoint's central offices that are often far apart. Tr. I: 140-146 ( Kittredge).

Among other things, the Project was intended to provide 100 Mbps fiber optic broadband capability over an 1,100-mile network that would pass through more than 100 communities and reach 110,000 households, 600 community anchor institutions, and a number of last-mile CLEC and ILEC service providers. *Id.* ¶ 19. At least 75% of the areas intended to be served by the Three Ring Binder were underserved or unserved as of 2009. Joint Ex. 1 at GWI-3932.

In July 2009, GWI applied for a federal grant to build the Three Ring Binder Project. Joint Ex. 1. The grant application was made to the United States Department of Commerce, National Telecommunications and Information Administration, pursuant to the federal American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (2009).

GWI's application required it to assign the project to a new entity, Maine Fiber, that would be responsible for constructing and owning the Three Ring Binder Project. *Id.* Maine Fiber would be required to make the Three Ring Binder Project available on an "open access" basis so that any ILEC or CLEC could purchase or lease dark fiber from the Three Ring Binder to extend last-mile service to its residential or business customers. *Id.*; Tr. I: 54 (Linley). The Authority, the Governor's office, the State's legislative delegation to Washington, and many CLECs, ILECs, and municipalities supported GWI's application. Tr. I: 53 (Linley), 92 (Kittredge); Joint Ex. 1 at GWI-3997-GWI4009.

In December 2009, GWI received a federal grant in the amount of $25,402,904 to fund the construction of the Three Ring Binder Project ("the Grant"). Stip. ¶ 18. The Grant provided approximately 80% of the cost for the construction of the Three Ring Binder Project and required a 20% match of the estimated initial capital cost to come from private individuals or entities. Stip. ¶ 25.

The Grant required GWI to transfer the right to receive the funds from the Grant to Maine Fiber and required the Three Ring Binder to be completed within three years from the Grant date, December 1, 2009. *Id.* ¶ 24; Joint Ex. 2 at 3; Joint Ex. 1 at GWI-4067-GWI-4073; Pl.'s Ex. 4 at 1-4.

On April 17, 2010 and June 30, 2010, GWI assigned the Grant to Maine Fiber. Stip. ¶ 24. As a result, Maine Fiber holds title to the Three Ring Binder Project and is a "dark fiber provider" within the meaning of Maine's Broadband Sustainability Act, 35-A M.R.S.A. §§ 102 and 9216. *Id.* ¶¶ 27-28. Since 2010, and at all relevant times, Maine Fiber has made the Three Ring Binder Project available for use by telecommunications service providers such as GWI on an open-access basis. *Id.* ¶ 31.

6

C. <u>An Act to Enable the Installation of Broadband Infrastructure</u>

When Maine Fiber was formed, it lacked legal authority to attach dark fiber and equipment to utility poles owned by ILECS and other pole owners, and the legal authority to construct the Three Ring Binder within the public rights of way. Pl.'s Ex. 4 at 4-7; Tr. I: 53-54 (Linley). In light of the three-year timeline for completion of the Three Ring Binder, emergency legislation in the form of LD 1778, "An Act to Enable the Installation of Broadband Infrastructure," was introduced in February 2010, during the 124th Maine Legislature's second session, to provide Maine Fiber with the necessary authority. Pl.'s Ex. 2; Tr. I: 54-55 (Linley).

On February 24, 2010, the Legislature's Joint Committee on Utilities and Energy held a public hearing at which GWI, Maine Fiber, and the Authority testified in favor of LD 1778. *See* Pl.'s Exs. 4-5. FairPoint, however, opposed LD 1778, asserting that the Three Ring Binder Project would overbuild the existing broadband network. Pl.'s Ex. 3 at 122-24, 127-28; Tr. I: 56-57 (Linley).) Following a number of work sessions regarding L.D. 1778, the Chairs of the Joint Committee on Utilities and Energy directed a working group to get together and come up with a compromise that would be acceptable to both sides. Tr. I: 57 (Linley); Tr. II: 109 (testimony of Dwight Allison, chief executive officer of Maine Fiber). GWI was not part of the working group. Tr. II: 110 (Allison).

The working group reached a compromise that was acceptable to Maine Fiber, FairPoint, and others in the working group. Tr. I: 58 (Linley). The compromise was memorialized in Committee Amendment A to LD 1778. In addition to granting Maine Fiber pole attachment rights and the right to construct the Three Ring Binder within the public right of way, the Amendment provided for a "broadband sustainability fee" (BSF) to be collected from users of the Three Ring Binder's dark fiber and a new fund called the Broadband Sustainability

7

Fund (BSF). Pl.'s Ex. 7. GWI did not oppose LD 1778, as amended by Committee Amendment A. Tr. I: 193 (Kittredge), 59 (Linley).

Following a further amendment, LD 1778 was approved by the Maine House and Senate, becoming law on April 6, 2010, *see* 2009 Me. Laws ch. 612. Joint Ex. 4; Pl.'s Ex. 9. LD 1778 is codified in the Maine Revised Statutes at 35-A M.R.S. § 9216. *E.g.* Pl.'s Ex. 3.

As enacted in 2010, the Broadband Sustainability Act does not make mention of the Three Ring Binder or Maine Fiber, but it was drafted so as to make it applicable only to a dark fiber provider that offers "federally supported dark fiber"—the parties agree that the only dark fiber provider in Maine that meets the definition in the Act is Maine Fiber and the only "federally supported dark fiber" in Maine is the dark fiber within the Three Ring Binder.

D. Mechanics of 35-A M.R.S.A. § 9216 and the BSF

The Broadband Sustainability Act imposed the BSF on any entity that purchased, leased, or otherwise obtained federally supported dark fiber from Maine Fiber. 35-A M.R.S.A § 9216(2). The Act required Maine Fiber to collect the BSF from these entities and remit the amounts collected to the Authority. *Id.* § 9216(3)[3].

The Authority, in turn, was required to deposit 5% of the funds received into the ConnectME Fund and was permitted to use said funds to support its activities under sections 9216 and 9204. *Id.* § 9216(4)(A). The Authority's 5% share of the BSF reflects a fair approximation of the actual cost to the Authority to administer section 9216. Stip. ¶ 48. The remaining 95% of BSF funds collected by Maine Fiber and remitted to the Authority was to be deposited into the Broadband Sustainability Fund. 35-A M.R.S.A. § 9216(4)(B). Under the statute, ILECs such as FairPoint were provided a right of first refusal to access the money in

---

[3] Unless otherwise noted, references herein to section 9216 refers to the version in effect between April 6, 2010 and October 14, 2015, when the repeal of the BSF took effect. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015).

the Broadband Sustainability Fund. *Id.* § 9216(6). To receive a disbursement from the Broadband Sustainability Fund, an ILEC had to file a request for funds "together with a certification indicating that the funds requested will be used to deploy broadband infrastructure in unserved areas within the carrier's service territory." *Id.* § 9216(6)(B). Any remaining money in the Broadband Sustainability Fund was to be transferred to the ConnectME Fund. *See id.* § 9216(6)(D).

E. Construction and Operation of the Three Ring Binder

Construction of the Three Ring Binder began no later than March 2010. Maine Fiber permitted GWI to determine where the first segments of the Three Ring Binder would be built. Tr. I:195-96, 205-06.) At GWI's request, Maine Fiber built the first five-mile segment between Bath and Brunswick and the next segment between Portland and Biddeford. *Id.* Both segments directly benefited GWI by enabling it to provide broadband to important commercial customers. *Id.*

The Three Ring Binder was substantially completed in or around July 2012. *Stip.* ¶ 34.

F. Maine Fiber's Competitive Position Versus Other Providers of Dark Fiber

Since May 2010, and at all relevant times, Maine Fiber has made the Three Ring Binder Project available on an open-access basis without discrimination. Stip. ¶ 31. Because approximately 80% of the Three Ring Binder's initial capital cost was financed with government funds, Maine Fiber has been able to charge lower prices for licensing dark fiber than FairPoint, the provider of most of the other dark fiber in Maine, has charged, even when the BSF is factored into Maine Fiber's price. *Compare* Pl.'s Exs. 9 at 2, 43, 47; GWI Exs. 13 at 19; *with* Joint Ex. 1 at GWI 3943, 3980-81; Tr. I: 209-213 (Kittredge); Tr. II: 26 (Kittredge).

From February 2010 until no earlier than October 15, 2015, Maine Fiber's only

significant competitor as a provider of dark fiber in Maine was FairPoint.[4] Joint Exh. 1 at GWI-3943 ("The incumbent local exchange carrier (ILEC) is currently the only existing service provider in the proposed funded service area for this middle mile project."); Tr. I: 143-146, 207-208.

Since 2009 or earlier, FairPoint has licensed its dark fiber in Maine to third parties at a price of $25 per strand mile. Joint Exh. 1 at GWI-3981. At all relevant times, the FairPoint dark fiber available for license to third parties connected FairPoint's central offices with one another and is called IOF (inter-office facility) dark fiber. Tr. I: 143-146.

Because approximately 80% of the Three Ring Binder's initial capital cost was financed with government funds, Maine Fiber has been able to charge substantially lower prices to users of its dark fiber than its competitor FairPoint has charged for its dark fiber. From February 2010 until no earlier than October 15, 2015, the prices at which Maine Fiber offered its dark fiber on the Three Ring Binder for license, even with the BSF included in the price, were substantially less than the prices at which Maine Fiber's competitor FairPoint made its dark fiber available for license in Maine. *Compare* Plaintiffs' Exhs. 43 & 47, GWI Exh. 13 at 19, and Plaintiffs' Exh. 9 at 2 (because the cost of dark fiber on the Three Ring Binder "is substantially lower than the market price for dark fiber in Maine, the small fee, $3 initially and going down to $2 after 5 years, still results in dark fiber being about 35% lower than the current market price") *with* Joint Exh. 1 at GWI-3943 ("The incumbent local exchange carrier (ILEC) is currently the only existing service provider in the proposed funded service area for this middle mile project."), Joint Exh. 1 at GWI-3980-GWI-3981, Tr. I: 209-213, and Tr. II: 26 ($25 per

---

[4] At various times since 2009, in addition to Maine Fiber and FairPoint, certain other telecommunications service providers in Maine have made limited amounts of dark fiber available for license to third parties. Joint Exhs. 17-20, 22-23. These other providers of dark fiber include MaineCom, Oxford Networks, Lincolnville Networks, and OTT. Joint Exhs. 17-20, 22-23.

strand mile per month for FairPoint's IOF dark fiber, according to GWI). *See also* Joint Exhs. 17-20, 22-23.

G. GWI's Use of and Agreements Regarding the Three Ring Binder Project

Since 2010, GWI has gained access to, and has utilized, dark fiber and dark fiber strands in the Three Ring Binder. The terms under which Maine Fiber has granted GWI access to the Three Ring Binder have been memorialized in a series of Dark Fiber Use Agreements ("DFUA") between GWI and Maine Fiber. Stip. ¶ 32. Usage of dark fiber is measured in "strand miles," meaning one mile of one dark fiber strand. The original DFUA required GWI, among other things, to pay Maine Fiber $10,000 per month for the use of up to 10,000 strand miles of dark fiber per month as soon as the Three Ring Binder Project was substantially completed. *Id.* ¶ 33.) GWI also expressly agreed that it "shall be responsible for any taxes or fees" including the BSF. Joint Ex. 10 at 7, § 5.

GWI and Maine Fiber have amended the DFUA multiple times, but the provision in which GWI agreed to be responsible for the BSF remained in force until GWI and Maine Fiber entered into the May 30, 2014 Dark Fiber Use and Settlement Agreement ("Dark Fiber Settlement"). Tr. I: 220-22 (Kittredge). The Dark Fiber Settlement resolved a lawsuit between GWI, on the one hand, and Maine Fiber and its CEO Dwight Allison, on the other. Tr. II: 11 (Kittredge); Pl.'s Ex. 34. In that Agreement, GWI agreed to pay Maine Fiber a fixed monthly fee for the right to use up to 10,000 strand miles per month of dark fiber and again agreed that it "shall be responsible for and shall pay any taxes or fees" including the BSF. Pl.'s Ex. 35 at 3-7, 9, § 5.

GWI is not the only entity to have obtained access to dark fiber and/or dark fiber strands from Maine Fiber. *See id.* ¶¶ 38, 45. At all relevant times, Maine Fiber has billed the BSF to every entity, including GWI, that purchased, leased, licensed, or otherwise obtained

11

dark fiber and/or dark fiber strands from Maine Fiber pursuant to former 35-A M.R.S.A. § 9216. Stip. ¶ 38.

Coincidentally or not—Plaintiffs say not-- GWI paid Maine Fiber's billings for BSF while the Three Ring Binder was being constructed and stopped paying the BSF component of Maine Fiber's bills around the time construction was completed. From approximately May of 2010 until May 2012, GWI paid Maine Fiber the BSF it was invoiced. *Id.* ¶ 39. This amounted to approximately $15,000, which Maine Fiber remitted to the Authority. *Id.* ¶ 40. Since June 2012, GWI has not paid any of the BSF billed to it by Maine Fiber. *Id.* ¶ 41. GWI has not reduced its fees charged to customers to reflect the amount saved by nonpayment of the BSF. Tr. II: 4, 54-55.

In 2015, the 127th Maine Legislature voted to repeal the BSF fee, effective 90 days from adjournment. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015); Stip. ¶ 42. Calculated through and ending as of October 15, 2015, when the repeal took effect, the total amount billed to GWI for the BSF and not paid by GWI is $406,852. *Id.* ¶ 43; Joint Exh. 14. GWI does not challenge the accuracy of Maine Fiber's billing or the calculation of what would be due if GWI is liable for the BSF.

Maine Fiber has remitted approximately $776,000 in BSF to the Authority. *Id.* ¶ 45. To date, approximately $41,601 in BSF from the Broadband Sustainability Fund has gone unclaimed and was transferred to the ConnectME Fund for use by the Authority in accordance with 35-A M.R.S.A. § 9211. *Id.* ¶ 50.

Because the Broadband Sustainability Act applies only to the Three Ring Binder, no provider of dark fiber other than Maine Fiber has been required to collect the BSF from users of dark fiber.

12

H. Metcalfe's Law

One of the justifications that the Plaintiffs advance in defending the BSF against Defendant's challenges lies in Metcalfe's Law. According to Metcalfe's Law, the value of a telecommunications network such as the Internet increases in proportion to the square of the number of connected users, meaning that a network becomes geometrically more valuable each time a new user is connected to that network. *See* Pl.'s Ex. 45 at GWI-4286-4287. Thus, under Metcalfe's Law, GWI and all other CLECs benefit when the network to which they connect is expanded, even if the expansion is by a competitor. *Id.*; Tr. I: 182-185 (Kittredge Testimony). However, the growth in value curve levels out when a network reaches a certain size, because the incremental increase in value attributable to each new connection becomes smaller to the point of being minimal. *See* Tr. I: 179-180 (Kittredge).

## *II. Discussion*

From the Plaintiffs' standpoint, this is a straightforward collection case. They seek judgment against GWI for $406,852—the amount that GWI does not deny would be the amount due, with interest, if it is indeed liable to the Plaintiffs for the BSF. However, GWI's First Amended Answer and Counterclaim denies any liability to Plaintiffs for the BSF on various jurisprudential, constitutional and statutory grounds.

The Amended Answer includes affirmative defenses—lack of authority and lack of privity—that challenge the Plaintiffs' standing to collect amounts due from GWI for the BSF, and that challenge the legality of the BSF on several grounds, discussed in detail below.

The Counterclaim contains three counts for declaratory judgment (Counts I, III and IV) and a count for return of the BSF that GWI did pay, prior to June 2012 (Count II). The declaratory judgment counts seek to have the BSF declared invalid and unenforceable on a variety of grounds, including that it is an unconstitutional tax, that it violates GWI's rights to

13

due process and equal protection, and that the BSF is preempted by federal law and/or violates the Supremacy Clause of the United States Constitution. In its post-trial filing, GWI did not pursue the preemption/Supremacy Clause objection to the BSF, so that issue is not considered further in this Decision and Judgment. GWI has pursued the standing, equal protection, due process and tax issues, and they are discussed below in the order just listed.

A. Whether the Authority has Standing to Collect the BSF Directly From GWI

GWI contends that the Authority lacks standing to collect the BSF directly, because the Legislature has explicitly placed that responsibility on Maine Fiber in 35-A M.R.S.A. § 9216(3). While GWI recognizes that the Authority was granted the implied power to do anything necessary "to exercise the powers granted in this chapter," it argues that the Authority was never given the power to collect the BSF at all. GWI further argues that, to the extent the Authority seeks to collect from GWI as a third-party beneficiary to the contract between GWI and Maine Fiber, the Authority failed to plead third-party beneficiary status or raise that issue in its pretrial statement of factual and legal issues and, in any event, the contract does not reflect an intent to benefit the Authority.

Plaintiffs contend that the Authority has the express legal right to directly collect the unpaid BSF from GWI because it has the power to file a lawsuit, to "do any act necessary or convenient to exercise the powers granted in [Chapter 93 of Title 35-A] or reasonably implied by th[at] chapter[.]" Plaintiffs further argue that they are third-party beneficiaries of the July 16, 2010 DFUA and the May 30, 2014 Dark Fiber Settlement with respect to the provision in which GWI agrees to be responsible for paying the BSF. Plaintiffs request GWI pay the $406,852.00 it allegedly owes to the Authority and/or the State and requests that GWI be held liable for Plaintiffs' costs.

14

35-A M.R.S.A. § 9216 provides, in pertinent part, that any "entity that purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider is subject to the following broadband sustainability fees...." 35-A M.R.S.A. §9216(2). Thus, GWI's obligation to pay the BSF is a duty imposed by statute directly upon users of the Three Ring Binder. To the extent it is a tax rather than a fee, as GWI contends (and, for the reasons set forth below, the court agrees), it is a levy directly against users such as GWI. Maine Fiber's only role is to collect and remit the BSF, in the same way that the seller of merchandise subject to sales tax collects and remits the sales tax attributable to the sale. It may be that the Plaintiffs could have proceeded against Maine Fiber for failing to collect the BSF from GWI, but that possibility does not preclude the Plaintiffs from proceeding directly against GWI, the party statutorily obligated to pay the BSF.

The State of Maine clearly has standing to collect any tax from the person who owes it, and the statute's broad grant of power to the Authority confers standing on the authority as well:

> In order to carry out the purposes of this chapter, the authority has the following powers with respect to a project together with all powers incidental to or necessary for the performance of these powers:
>
> 1. Power to sue and be sued. To sue or initiate or appear in any proceeding...
>
> 20. All acts granted or implied. To do any act necessary or convenient to exercise the powers granted in this chapter or reasonably implied by this chapter.

35-A M.R.S.A. § 9205.

Alternatively, the Authority is entitled to collect the BSF from GWI as a third-party beneficiary under the July 16, 2010 DFUA and the Dark Fiber Settlement. In order to prevail on a third-party beneficiary contract claim, the beneficiary must "demonstrate that the promisee, [GWI], intended to give the plaintiffs the benefit of the performance." *F.O. Bailey*

15

*Co. v. Ledgewood, Inc.*, 603 A.2d 466, 469 (Me. 1992); *see also Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 12, 26 A.3d 787. In *Bailey*, the Law Court quoted with approval section 302 of the Restatement (Second) of Contracts, which provides "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance"). *F.O. Bailey Co.*, 603 A.2d at 469. The court further noted that "[s]uch an intention is gathered from the language of the written instruments and the circumstances under which they were executed." (citation omitted). *Id.*

"When contract language is ambiguous or uncertain, its interpretation is a question of fact to be determined by the factfinder, but when the language is clear, it is a question of law and can be resolved by the court." *Id.* (citations omitted).

The July 16, 2010 DFUA and May 30, 2014 DFUSA both provide that GWI "shall be responsible for any taxes or fees" including the BSF. (Joint Ex. 10 at 7 §5; Pl.'s Ex. 35 at 9 §5.). These provisions, in light of Maine Fiber's statutory duty to collect and remit the BSF, clearly intend to give Plaintiffs the benefit of GWI's contractual obligation to pay the BSF to Maine Fiber, . 35-A M.R.S.A. § 6216(3). Accordingly, the Authority has standing to collect the BSF from GWI as a third-party beneficiary.[5]

In sum, the court concludes that the Plaintiffs have standing to enforce, by means of this collection action, violations of the statute mandating payment of the BSF, and, alternatively,

---

[5] While GWI is correct that Plaintiffs did not explicitly raise the third-party beneficiary argument in their pleadings or pretrial statement of factual and legal issues, the court concludes that Plaintiffs did not waive this argument in light of the limited pre-trial record, the clear undisputed evidence, and GWI's awareness and ability to respond to this argument at trial. Plaintiffs' third-party beneficiary argument is based simply on the language of the statute and the DFUAs admitted into evidence.

16

that the Authority has standing as a third-party beneficiary of GWI's contractual agreement to pay the BSF.

B. Whether the BSF Violates GWI's Right to Equal Protection

GWI contends that the BSF statute violates its right of equal protection because it does not treat all users of dark fiber in Maine equally. GWI is correct in asserting that not every user of dark fiber in Maine is required to pay the BSF. However, the State responds by saying that the relevant class is not users of dark fiber in Maine, but rather users of the Three Ring Binder dark fiber. Because the BSF statute treats all users of the Three Ring Binder equally, the State contends there is no equal protection violation.

To determine whether a statute violates the equal protection clause, the court employs a two-step test:

> First, the party challenging the statute must show that similarly situated persons are not treated equally under the law. Where this step is met, the Court must then determine what level of scrutiny to apply.

*Town of Frye Island v. State*, 2008 ME 27, ¶ 14, 940 A.2d 1065.

"All legislative enactments are presumed constitutional, and the party challenging the constitutionality of a statute bears the burden of proof." *Aseptic Packaging Council v. State*, 637 A.2d 457, 459-60 (Me. 1994). "A statute's unconstitutionality must be established to such a degree of certainty as to leave no room for reasonable doubt." *Id.* at 459. Although legislative enactments are generally presumed to be constitutional, "the presumption of validity is not absolute." *McNicholas v. York Beach Village Corp.*, 394 A.2d 264, 269 (Me. 1978).

1. *Whether GWI has Shown that Similarly Situated Persons are not Treated Equally*

GWI's equal protection claim is based on the Legislature's decision to impose the BSF only on entities using Maine Fiber's "federally supported dark fiber" and not on entities using dark fiber that is not part of the Three Ring Binder. GWI asserts that it has a "class of one"

17

equal protection claim based on the BSF's applicability to one specific grant-funded project, while allowing hundreds of other grant-funded projects with the same objectives to go unassessed.

Plaintiffs contend that GWI has not shown that entities situated similarly to GWI are treated differently under section 9216, because any other entity that wishes to purchase, lease, or obtain federally supported dark fiber would also be subject to the BSF. As Plaintiffs point out, Maine Fiber is the entity that is treated differently under section 9216 as it is the only purveyor of dark fiber that must collect the BSF from entities that elect to purchase, lease, or obtain federally supported dark fiber from it. Thus, Plaintiffs contend GWI lacks standing to make an equal protection argument that is Maine Fiber's to make.

However, the very statutory provisions that the court has decided grant standing to the Plaintiffs to pursue this collection action directly against GWI --the provisions imposing upon users of the Three Ring Binder dark fiber an explicit duty to pay the BSF for remittance to the Authority—also confer standing upon GWI, as a user obligated by the statute to pay the BSF. Furthermore, the court agrees with GWI that the appropriate class for equal protection purposes consists of all users of dark fiber in Maine, not just the users who obtain dark fiber from Maine Fiber. The BSF provision discriminates between the users of Maine Fiber's fiber and the users of other providers' dark fiber. Accordingly, the inquiry turns to whether the discrimination can be justified in terms of being rationally related to a legitimate state interest.

### 2. *Whether the Imposition of the BSF Only Upon Users of the Three Ring Binder is Rationally Related to a Legitimate State Interest*

Where a statute is challenged on equal protection grounds and does not deal with a fundamental right or a suspect class such as race, religion, or national origin, the court applies a "rational relationship" test. *Beaulieu v. City of Lewiston*, 440 A.2d 334, 338 (Me. 1982) ("It is clear that governmental efforts to alleviate social and economic problems may draw

18

constitutionally sound distinctions among beneficiaries if the dissimilar treatment is rationally related to the objectives of those efforts"). 35-A M.R.S.A. § 9216 involves neither a fundamental right nor a suspect class. "Thus it will survive an equal protection challenge if its classifications are rationally related to some legitimate governmental purpose." *Aseptic Packaging Council*, 637 A.2d at 459.

When, as is the case here, no fundamental right or suspect classification is involved, the party challenging the validity of a statute has the burden to show that "no facts exist upon which a rational basis supporting th[e] statute could be found." *State v. Haskell*, 2008 ME 82, ¶ 8, 955 A.2d 737, 740.

"A party alleging that a legislative classification violates equal protection must show by clear and irrefutable evidence its arbitrariness and irrationally discriminatory nature." *Aseptic Packaging Council*, 637 A.2d at 459. "[T]he rationality of a statute is not determined solely by looking to the legislative statement of fact. Instead, [the court] consider[s] whether any conceivable state of facts either known, or which can reasonably be assumed, supports the legislative action." *Aseptic Packaging Council*, 637 A.2d at 459. "The State has no burden to come forward with such 'conceivable facts,' but rather, it is the contestant who retains the burden of proving that no conceivable state of facts exists." *Id.* at 460.

GWI argues that section 9216 is not rationally related to a legitimate governmental interest because it was created in order to reach a compromise in the face of FairPoint's opposition to the Three Ring Binder Project. GWI contends that the BSF is arbitrary because it targets a class that contributes to ameliorating a perceived harm—lack of high speed broadband in rural areas of Maine—rather than targeting a class that contributes to the perceived harm. However, whether or not these were the Legislature's actual reasons for enacting the BSF is beside the point—as noted above, the question is whether GWI can

19

overcome the presumption of constitutionality by establishing that there is no set of facts that can furnish a rational basis for the imposition of the BSF.

Plaintiffs contend that the imposition of the BSF on users of the Three Ring Binder is rationally related to at least two legitimate governmental interests including: 1) the desire to balance a perceived competitive advantage that could permit CLECs to undercut prices charged by ILECs for telecommunications services; and 2) providing funds to encourage ILECs to deploy broadband infrastructure in unserved areas within their service territories. The court agrees with Plaintiffs that both of these are legitimate governmental interests, and that the BSF is rationally related to both

Thanks to the federal subsidy, Maine Fiber's rates per strand mile were significantly less than rates charged by FairPoint, the only other significant provider of dark fiber in Maine. The Legislature could rationally have decided that the competitive rates enjoyed by users of the Three Ring Binder as a result of the federal subsidy justified imposition of the BSF. Also, given that the very purpose of LD 1778 was to enable the Three Ring Binder's dark fiber and related equipment to be installed on the utility poles owned by FairPoint and other ILECs, the Legislature could rationally have decided that a portion of the fee could be applied to enable FairPoint and other ILECs to expand their broadband networks.

Decisions in other jurisdictions make it clear that offsetting a competitive advantage—especially one resulting from taxpayer subsidies—can serve as a rational basis for differential treatment of taxpayers. *See Qwest Corp. v. Iowa State Bd. of Tax Review*, 829 N.W.2d 550, 562 (Ia. 2013) ("The legislature could have rationally believed that the ILECs had a powerful built-in competitive advantage based on their existing facilities, whose development had been underwritten by Iowa ratepayers over the past century"); *Verizon New Jersey Inc. v. Hopewell Borough*, 26 N.J. Tax 400, 428, 2012 N.J. Tax LEXIS 10 *46 (Tax Ct. 2012) ("[T]here was a

20

rational basis to continue to impose the personal property tax only on those local telephone companies that had, for many years, enjoyed a monopoly over the provision of local telephone service in their franchise areas.")[6]

In addition, section 9216 and the BSF are rationally related to the legitimate governmental interest of encouraging ILECs to deploy broadband infrastructure in unserved areas within their service territories. While GWI contends that charging the BSF undermines the goal of expanding broadband infrastructure by taking money from CLEC users of the Three Ring Binder that they could use to expand their own networks, Metcalfe's Law suggests that any expansion of the broadband network benefits CLECs as well as the ILECs directly benefited by the Broadband Sustainability Fund.

Thus, there are several states of fact that supply a rational basis for the imposition of the BSF upon users of the Three Ring Binder. The court concludes that GWI has not met its burden of persuasion on its equal protection claim.

C. Whether section 9216 Violates GWI's Right to Due Process

In order to successfully challenge the constitutionality of a statute on due process grounds, "a party must establish the complete absence of any set of facts that would support the need for its enactment." *Aseptic Packaging Council*, 637 A.2d at 461 (quoting *State v. Eaton*, 577 A.2d 1162, 1165-66 (Me. 1990). "[T]he requirements of due process in the exercise of the State's police power [are] as follows:

1. The *object* of the exercise must be to provide for the public welfare.
2. The legislative *means* employed must be appropriate to the achievement of the ends sought. [and]

---

6 The New Jersey Tax Court opinion in *Verizon New Jersey* notes that a tax differential based on mitigating a taxpayer-subsidized competitive advantage is justified only for as long as the competitive advantage lasts. *See* 26 N.J. Tax at 428, 2012 N.J. Tax LEXIS 10 at *46. In that regard, it is noteworthy that the Maine Legislature saw fit to repeal the BSF in 2015. *See* 2015 Me. Laws, ch. 151, §2 (eff. October 15, 2015).

21

3.    The *manner of exercising* the power must not be unduly arbitrary or capricious."

*Id.* (quotations omitted) (emphases in original).

"A substantive due process analysis focuses on the rationality of the enactment, that is, on whether the regulation at issue is in the interest of the public welfare and whether the methods used bear a rational relationship to its intended goals." *Nugent v. Town of Camden*, 710 A.2d 245, 249 (Me. 1998).  Courts applying the rational basis standard will not set aside even a discriminatory statutory scheme if "any state of facts reasonably may be conceived to justify it." *Bowen v. Gilliard*, 483 U.S. 587, 600-01 (1987) (internal citation omitted).

GWI contends the BSF does not satisfy the due process test facially or as applied.  It contends that the BSF is not an appropriate or effective method of providing funds to expand broadband to unserved areas because it is levied against entities that are attempting to carry out that very objective, and it inhibits their ability to do so.  As the BSF is applied, GWI contends that the BSF requires an entity purchasing or leasing dark fiber from the Three Ring Binder to charge its end users more money, thereby undermining the objectives of the BSF.

Plaintiffs assert, and the court agrees, that the Legislature could rationally have determined that imposing the BSF on users of the Three Ring Binder in order to promote the deployment of broadband infrastructure in unserved areas serves the public interest.  Also, Plaintiffs assert, and the court agrees, that the Legislature could rationally have viewed the BSF as promoting competition among dark fiber providers by mitigating the taxpayer-subsidized competitive advantage that the Three Ring Binder enjoyed through offering lower user rates.

Thus, the court rejects GWI's due process challenge for essentially same reasons as its equal protection claim. The BSF and section 9216 were enacted with the aim of expanding broadband to unserved or underserved territories. This was carried out by imposing the BSF on entities that purchased, leased, or obtained federally supported dark fiber from the Three Ring Binder and providing ILECs a right of first refusal to request that money in order to deploy broadband infrastructure in unserved areas within their territory.

While reasonable minds might debate the merits of this approach, the court concludes that it was not "unduly arbitrary or capricious" as it advances the valid public purpose of expanding broadband infrastructure to unserved areas.

D. Whether the BSF is a Fee or a Tax

GWI also contends that the BSF is a property tax that violates the Maine Constitution because it is not equally applied and is not based on the value of the taxed property. *See* ME. CONST. art. IX, § 8. It is undisputed that the BSF is not apportioned and assessed equally and is not based on value; it applies only to "an entity that purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider." 35-A M.R.S. § 9216.

Plaintiffs respond by contending that the BSF is, as the name suggests, a fee and not a tax. In the alternative, they contend that, even if the BSF is deemed a tax, it must be deemed an excise tax rather than a property tax, and that it is valid because excise taxes are outside the scope of the Article IX, section 8 constitutional provision that GWI's argument rests upon.

The analysis begins with 1) whether the BSF is a tax or fee, and then turns to 2) if the BSF is a tax, whether it is an excise tax or a property tax. In addressing these issues, the court

23

looks beyond the label attached by the Legislature to the true nature of the assessment. *E.g.*

*United States v. Maine*, 524 F. Supp. 1056, 1059 (D. Me. 1981).[7]

The distinction between a tax and a fee "is one of purpose and of degree of particularity." *Butler v. Supreme Judicial Court*, 611 A.2d 987, 990 (Me. 1992).

In determining whether an assessment is a fee or a tax, the court analyzes: (1) whether the primary purpose is to raise revenue; (2) whether the assessment is "paid in exchange for exclusive benefits not received by the general public"; (3) whether the assessment is voluntary; and (4) whether the assessment is "a fair approximation of the cost to the government and the benefit to the individual of the services provided." *City of Lewiston v. Gladu*, 2012 ME 42, ¶ 9, 40 A.3d 964 (quoting *Butler*, 611 A.2d at 990).

The test indicates an assessment is a tax if: (1) the assessment's primary purpose is to raise revenue, as opposed to furthering a regulatory purpose; (2) the assessment is paid in exchange for benefits enjoyed by the general public, as opposed to benefits exclusive to those assessed; (3) the assessment cannot be avoided by the subject; and (4) the assessment does not fairly approximate the cost to the government and benefit conferred to the user. *See id.* ¶¶ 13-26.

The four-part test is similar to those used in other jurisdictions. *Id.* (citing *Church of Peace v. City of Rock Island*, 828 N.E.2d 1282, 1284 (Ill. App. Ct. 2005) (listing regulatory purpose, proportionality to the cost of the service, and voluntariness as the three requirements for a stormwater service charge to be a fee and not a tax); *Long Run Baptist Ass'n v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 775 S.W.2d 520, 522 (Ky. Ct. App. 1989) ("A tax is universally defined as an enforced contribution to provide for the support of government, whereas a fee is a charge for a particular service"). "Although some jurisdictions have held that the benefits must

---

[7] This court "must regard things rather than names," *Pace v. Burgess*, 92 U.S. 372, 376 (1875), and so must analyze the nature of the assessment to determine whether it is indeed a fee or is in fact a tax.

24

be direct and exclusive . . . the trend seems to be in favor of upholding fees that confer intangible benefits on both those who are assessed and those who are not." *Id.* (quoting Avi Brisman, *Considerations in Establishing a Stormwater Utility,* 26 S. Ill. U. L.J. 505, 521-22 (2002) (cited with approval in *McLeod v. Columbia Cnty,* 599 S.E.2d 152, 155 (Ga. 2004)).

   1. *Whether the Assessment's Primary Purpose is to Raise Revenue or to Further a Regulatory Purpose*

Under the statute, 95% of the BSF funds remitted to the Authority were to be deposited into the Broadband Sustainability Fund and made available, through a right of first refusal, to ILECs who filed a request and certification that the funds "will be used to deploy broadband infrastructure in unserved areas within the carrier's service territory." 35-A M.R.S.A. § 9216(6)(B). The remaining 5% of BSF funds, along with any portions of the Broadband Sustainability Fund not requested and utilized by ILECs, were to be transferred to the ConnectME Fund. *Id.* at §9216(6)(D).

GWI contends the BSF is designed to raise revenue for the Broadband Sustainability Fund, which is analogous to the common practice of earmarking certain tax revenue for a particular purpose. Accordingly, GWI argues the BSF is a tax, even though it is designed to provide service in unserved areas. Plaintiffs contend that the primary purpose of the BSF is to further the regulatory purpose of deploying broadband infrastructure in unserved areas in Maine.

Because nearly all of the BSF funds are made available to ILECS, the court determines that the first factor indicates the BSF is a fee intended to promote the regulatory purpose of developing broadband infrastructure in unserved areas within an ILEC's service territory. The present situation is analogous to *Tukwila School District No. 406 v. City of Tukwila,* relied upon by *Gladu,* in which a stormwater fee met the regulatory-purpose requirement when it was enacted to provide revenue to—among other things—construct, reconstruct, and improve

25

facilities and activities in furtherance of a storm water utility plan. 167 P.2d 1167, 1172 (Wash. Ct. App. 2007) (discussed by *Gladu,* 2012 ME 42, ¶ 15, 40 A.3d 964).

While the BSF is intended to raise revenue, the revenue is required to be utilized in furtherance of a specific regulatory purpose. The fact that section 9216 utilizes ILECs to accomplish the regulatory goal does not transform the BSF into a revenue raising mechanism.

2. *Whether There is a Direct Relationship Between the BSF and the Benefit Conferred Thereby*

The funds raised through the BSF are either utilized by ILECs to deploy broadband infrastructure in unserved areas or, if not requested and granted to an ILEC, transferred into the ConnectME fund.

GWI argues that there is no direct relationship because the only benefit to GWI, if any, is based on benefits under Metcalfe's Law, which benefits everyone in the world connected to the Internet. Plaintiffs contend there is a close relationship because disbursements from the Broadhand Sustainability Fund will benefit individuals seeking better Internet service within any given ILEC's service area, and will benefit others that purchase, lease, or obtain dark fiber from the Three Ring Binder—such as GWI—by providing more potential customers, expanding the network for existing customers, and making the communications network in Maine more valuable.

In *Gladu,* the Law Court recognized a trend "in favor of upholding fees that confer intangible benefits on those who are assessed and those who are not." 2012 ME 42, ¶ 15, 40 A.3d 964. Based on that trend, *Gladu* determined that an assessment applicable to developed properties that receive the special benefit of having their stormwater managed in an effort to comply with state and federal laws favored upholding the stormwater fee. *Id.* ¶ 20.

Here, while GWI does not receive as direct a benefit from the BSF as the ILECs who can request the use of funds from the Broadband Sustainability Fund, Metcalfe's Law teaches

26

that all users of the Internet benefit from expansion. The court concludes that the BSF's purpose of expanding of the dark fiber network constitutes a benefit to users of the Three Ring Binder, albeit an intangible one, that satisfies the broad standard set forth in *Gladu*.

### 3. *Whether The BSF is Voluntary*

The BSF is imposed on any entity that "purchases, leases or otherwise obtains federally supported dark fiber from a dark fiber provider...." 35-A M.R.S.A. § 9216(2). Dark fiber is available for purchase or lease from dark fiber providers not supported by federal funds. (*See e.g.* Stip. ¶ 37.)

GWI argues that there is no way for it to avoid the BSF once it utilizes federally supported dark fiber. GWI contends that the focus should not be on whether an entity can avoid a fee by "choosing not to utilize the service" offered by the government. Instead, the court should determine whether there is a way to avoid paying the BSF once federally supported dark fiber is purchased, leased, or otherwise obtained. Plaintiffs contend that GWI was not compelled to use the Three Ring Binder and, thus, its payment of the BSF is voluntary.

In *Gladu*, the Law Court determined that a stormwater fee was voluntary because those assessed the fee could undertake certain efforts to avoid the fee, even though the cost of undertaking said efforts could be "quite high." 2012 ME 42, ¶¶ 22-23, 40 A.3d 964. On the other hand, the court emphasized the fact that the ordinance at issue included a 100% fee credit, and specifically declined to "consider whether a fee is voluntary if the applicable ordinance does not include a 100% fee credit." *Id.* at ¶23, 40 A.3d 964. Thus, *Gladu* can be read to indicate that the means of avoiding the assessment at issue needs to be found within the regulatory scheme itself.

On the one hand, the use of federally supported dark fiber is voluntary. Indeed, the present case presents a clearer example of voluntary action than *Gladu* because GWI

27

affirmatively chose to engage in the activity at issue with full knowledge that it would incur the BSF and could avoid the BSF by purchasing dark fiber from sources not supported by federal funding. On the other hand, the Broadband Sustainability Act contains no fee credit or other means of avoiding the BSF that would align the Act with the ordinance at issue in *Gladu*. The voluntariness factor is neutral for purposes of this analysis.

### 4. *Whether The BSF Constitutes a Fair Approximation of the Cost to the Government and Benefit to the Entity Subjected to the Assessment*

The statute provides for 95% of the BSF to be deposited in the Broadband Sustainability Fund and made available to ILECs to deploy broadband infrastructure in unserved areas within their service territory. 35-A M.R.S.A. §§ 9216(4), (6)(B). The remaining 5% is deposited into the ConnectME Fund, to support the activities of the Authority to implement section 9216 and generally further the deployment of broadband infrastructure in unserved areas in Maine. *Id.* at § 9216(4)(B); 35-A M.R.S.A. § 9204 (2010).

GWI argues that the BSF is not a fair approximation of the cost to the government and the benefit conferred to GWI because the only cost the State incurs is administering the program and the only benefit GWI receives are the very indirect benefits under Metcalfe's Law. Plaintiffs do not seriously challenge this contention, and instead emphasize that the assessment need only be a fair approximation, and that an assessment can still be a fee when it exceeds the government's costs.

Here, the fourth factor strongly indicates the BSF is a tax, not a fee. This is because only 5% of the funds received from the BSF are utilized by the Authority to defray the costs associated with the Broadband Sustainability Act. Admittedly, Metcalfe's Law indicates that the remaining 95% of the BSF redounds to the benefit of GWI and other users of the Three Ring Binder by supporting an expansion of the broadband network, but there is absolutely no evidence that this intangible, unmeasurable benefit has any particular relation to the BSF.

28

Balanced together, the four factors indicate that the BSF is a tax, not a fee. While the first two factors point in the direction of the BSF being a fee and the third is neutral, the fourth factor points so strongly against the BSF being a fee that it compels the conclusion that the BSF is a tax.

E. Whether the BSF is a Property Tax or Excise Tax?

GWI contends that, if the BSF is indeed a tax, it is a property tax that violates Article IX, section 8 of the Maine Constitution, because it is not equally applied to all users of dark fiber and also because it is not based on the just value of the property, i.e., the dark fiber. GWI argues that the BSF is a property tax because it focuses on how much dark fiber an entity purchases, leases, or obtains without regard to the use made of the dark fiber. Indeed, GWI contends that the BSF applies regardless of whether the dark fiber is utilized by the purchasing or leasing entity. The Plaintiffs respond that Article IX, section 8 applies only to property taxes, not excise taxes, and that, even if the BSF is a tax, it is not a property tax.

Article IX, section 8 provides in pertinent part that "[a]ll taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally according to the just value thereof." ME. CONST. Art. IX, § 8. "This constitutional provision establishes two requirements for a valid property tax: a valuation requirement and an apportionment requirement." *Eastler v. State Tax Assessor*, 499 A.2d 921, 924 (Me. 1985).

Under the valuation requirement, the tax-levying authority must determine the market value of the property. *Id.* (citation omitted). Under the apportionment requirement, the taxing authority must apportion the tax equally according to the market value. *Id.* "The purpose of the two constitutional requirements is to equalize public burdens so that a taxpayer contributes to the entire tax burden in proportion to his share of the total value of all property subject to the tax." *Id.* (citation omitted).

29

Taxes on businesses, or excise taxes, however, are not limited by the Maine Constitution so long as the tax is for a public purpose and assessed uniformly upon all businesses of a like kind. *Id.* at 924 (citations omitted). Stated differently, "[a] property tax is levied on the ownership of property, while an excise tax may only be levied on a use of the property." *Id.* (citations omitted).

Distinguishing between the two "becomes difficult, however, when the amount of the purported excise tax is measured by the property in the hands of the tax payer." *Id.* To make this distinction, the court applies a two-part test "looking to the subject matter of the tax and examining the method of taxation not as an independent factor but as a key to determining what was in fact the subject matter." *Id.* at 925 (citations omitted). "The central issue in the determination of the nature of the tax is the subject matter of the tax. We examine the characteristics as a key to ascertaining what is in fact the subject matter of the tax." *Opinion of Justices of Supreme Judicial Court*, 501 A.2d 16, 20 (Me. 1985) (citing *Eastler*, 499 A.2d at 925).

In *State v. Western Union Tel. Co.*, the Law Court employed the two-part test to determine that a 2-1/2 percent tax on the value of telegraph company equipment was an excise tax, not property tax. 73 Me. 518, 525-29 (Me. 1882); *see also Eastler*, 499 A.2d at 924-25 (discussing *Western Union*). *Western Union* explained that, although the method for establishing the tax rate at issue was based on the total valuation of property, that valuation was in fact a measure of the value of the business. *Id.* at 527, 531; *see also Eastler*, 499 A.2d at 925. Furthermore, *Western Union* determined that the tax acted upon property that was used in the telegraph business only while the property was in use for the business. *Id.* Accordingly, *Western Union* determined that the tax was imposed against, not the property of the telegraph company as such, but against the franchise or business, and therefore was not subject to Article IX, section 8 of the Maine Constitution. *Id.* at 530-31; *see also Eastler*, 499 A.2d at 495.

30

In *Eastler*, the Law Court determined that a tax funding the cost of forest control through three sources was an unconstitutional property tax. *Id.* at 923. The three sources were: 1) municipalities and unorganized territories paying an initial amount up to a limit based on a percentage of valuation; 2) the State's general fund; and 3) a per acre tax on land protected by the forest control. *Id.* The State's general fund and the per acre tax on protected land split the remainder of the cost needed after collecting from the municipalities and unorganized territories. *Id.* In addition, each owner of protected land was entitled to an exemption of 500 acres of land in each municipality or unorganized territory. *Id.* The single issue posed in *Eastler* was whether the tax was a property tax "because it impose[d] a tax on ownership of property that [wa]s not apportioned according to the value of the land," or whether it was an excise tax because it was "imposed on the commercial use of property...." *Id.*

In concluding the forest tax was a property tax, *Eastler* explained that the method of rate determination—dividing one-half of the total state fire suppression cost by the acreage of the protected land—was commonly utilized in property taxes and that enforcement of the statute through a direct lien upon real estate further supported this conclusion. *Id.* at 925 (citations omitted). More importantly, *Eastler* determined that the tax was imposed based on the ownership of land, and not on land operated in a particular business. *Id.* (citations omitted). While the defendants argued that the tax was levied on the commercial forest industry, the court concluded that the statute's legislative history did not reveal this focus, the statute's language did not address commercial forestry, the tax was not limited to land used in commercial forestry, and the statute's benefits were not dedicated to the needs of the commercial forest industry. *Id.* at 925-27.

Here, the BSF imposes an assessment based on the number of miles of federally supported dark fiber strand purchased, leased, or used by an entity. 35-A M.R.S.A. § 9216(2).

31

Although the method of taxation focuses on the amount of property owned or utilized by the taxpayers, the court is mindful that excise taxes on business are frequently measured in this manner. *Eastler*, 499 A.2d at 925 (citing *Western Union*, 73 Me. 518). Accordingly, the court turns its analysis to the subject matter of the tax.

In this case, the court determines the BSF is analogous to the excise tax in *Western Union* and is readily distinguishable from the property tax in *Eastler*. Similar to *Western Union*, the BSF is a tax on equipment utilized by telecommunications service providers in the course of their business. GWI contends that the BSF must be deemed a property tax because it is not limited to utilization of dark fiber and extends to the purchase or lease of dark fiber. GWI contends an entity could purchase dark fiber from Maine Fiber and choose not to utilize it. But the same objection can be made to any excise or use tax—the excise tax on gasoline, for example, are likewise based on purchase of the item, presumably because the Legislature presumes that gasoline is purchased for use.

In 1923, the Supreme Judicial Court of Maine addressed the Legislature's questions about its authority to impose an excise tax on sale of gasoline: "... it is not the value of the gasoline and fuel as property owned which is the subject of taxation but the sale of and dealing in the article whatever its value. The tax is measured not by the worth of the commodities but by the amount of business transacted in dealing with them computed by gallons, and this fits the definition of an excise tax which is: a tax imposed upon the performance of an act, the engaging in an occupation or the enjoyment of a privilege." *See Questions Submitted by the House of Representatives to the Justices of the Supreme Judicial Court*, 123 Me. 573, 1923 Me. LEXIS 274 at *6-7, *quoting* 26 R. C. L., Page 236 (internal quotation marks omitted).

The BSF is essentially a tax on entities "dealing with the article," to quote the just-cited opinion. The problem with the forestland tax in *Eastler* is that it applied to any undeveloped

32

land, and not just to land used in commercial forestry. The BSF suffers from no such deficiency. Unlike the undeveloped land at issue in *Eastler*, there is absolutely no evidence that the Three Ring Binder dark fiber is purchased or leased for investment or for any other purpose than to be used by telecommunications service providers such as GWI to transmit data. In contrast to the forestland tax in *Eastler*, but like an excise tax per gallon of gasoline, the BSF is an excise tax on the use of property.

Accordingly, the court concludes that the BSF is a valid excise tax imposed on the use of property utilized primarily, if not exclusively, for business purposes. Because the court agrees with the substance of Plaintiffs' arguments, it need not and does not reach Plaintiffs' unclean hands defense.

### III. *Conclusion*

Based on the entire record, the court enters judgment set forth below. In the court's view, because the BSF is a valid excise tax payable by statute to the ConnectME Authority, the action could have been brought in the name of either Plaintiff. Accordingly, the court grants judgment to both on the Complaint for a single amount.

IT IS HEREBY ORDERED, ADJUDGED AND DECLARED AS FOLLOWS:

1. Judgment on Plaintiffs' Complaint for Collection of Unpaid Fees is awarded to Plaintiffs ConnectME Authority and State of Maine jointly in the total amount of $406,852.00, plus pre-judgment and post-judgment interest and costs. Costs are awarded to Plaintiffs as prevailing parties.

2. Judgment on Defendant's Counterclaim for Declaratory Relief and Money Had and Received is awarded as follows:

   a. Judgment on Counts I, III and IV is awarded to Defendant to the extent of this Decision and Judgment, and is otherwise denied. It is hereby declared as

33

follows: Plaintiffs have standing to collect the Broadband Sustainability Fee directly from Defendant pursuant to Chapter 93 of Title 35-A and as a third-party beneficiary to contracts between Defendant and Maine Fiber. The Broadband Sustainability Fee is a valid assessment in the nature of an excise tax that does not violate due process or equal protection and that is rationally related to the legitimate State interest of increasing broadband availability to unserved and underserved areas of Maine. Defendant is liable to Plaintiffs for the unpaid balance due from Defendant for the Broadband Sustainability Fee and Defendant is not entitled to return of the amounts already paid.

b. Judgment on Count II is awarded to Plaintiffs.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: October 5, 2016

A.M. Horton
Justice, Business & Consumer Court

Entered on the Docket: 10-5-16
Copies sent via Mail ___ Electronically ✓

34